UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JESÚS SÁNCHEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 2437 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THE VILLAGE OF WHEELING, M. BIESCHKE, VICTOR CHIRO, MICHAEL CONWAY, J. CONNOLLY, JOSEPH KOPECKY, IGNACIO OROPEZA, T. PINEDO, THE CITY OF EVANSTON, and JOE BUSH, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Jesús Sánchez brings this suit under 42 U.S.C. § 1983 and Illinois law against the Village of Wheeling, seven members of the Wheeling Police Department (Detective M. Bieschke, Sergeant Victor Chiro, Sergeant Michael Conway, Detective J. Connolly, Detective Joseph Kopecky, Detective Ignacio Oropeza, and Detective T. Pinedo), the City of Evanston, and one member of the Evanston Police Department (Detective Joe Bush), alleging various misconduct in connection with his arrest, interrogation, prosecution, and conviction for a murder for which he recently was exonerated. Docs. 1, 43. Evanston Defendants move under Civil Rule 12(b)(6) to dismiss all claims against them, Doc. 49, while Wheeling Defendants move under Rule 12(b)(6) to dismiss some claims against them, Doc. 47. The motions are granted as to Sánchez's § 1983 malicious prosecution claim and otherwise are denied.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, but not its legal conclusions. *See Zahn v. N. Am.*

1

*Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016).  The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Sánchez's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted).  The facts are set forth as favorably to Sánchez as those materials permit.  *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016).  In setting forth the facts at this stage, the court does not vouch for their accuracy.  *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Rafael Orozco was shot and killed the evening of May 1, 2013.  Doc. 1 at ¶ 19.  Sánchez, then eighteen years old, was near the scene with non-parties Bryan Estrada, Heladio Flores, Collin Scheffler, Leslie Rubio, and Bradley DeChambre.  *Id*. at ¶¶ 7, 20, 22-24.  When Sánchez, Estrada, and Flores were attempting to get into Sánchez's car, gang members began chasing them.  *Id*. at ¶¶ 25-26.  Sánchez and Estrada, who was then fourteen years old, ran.  *Id*. at ¶¶ 26-27, 53.  They were stopped and detained by Sergeants Conway and Chiro, handcuffed, taken to the Wheeling Police Department, and put into separate interrogation rooms.  *Id*. at ¶¶ 27-30.  Flores, then fifteen years old, also was stopped and taken to the Wheeling Police Department.  *Id*. at ¶¶ 32, 39.

From 10:20 to 11:40 that evening, Detectives Oropeza and Connolly interrogated Sánchez about the shooting.  *Id*. at ¶ 33.  Sánchez was not given *Miranda* warnings and the interrogation was not video-recorded.  *Id*. at ¶¶ 34, 37.  Detective Bieschke and non-party Detective McGuire conducted an unrecorded interview of Flores from 10:40 to 11:56 p.m.  *Id*. at ¶¶ 38-41.  Detectives Bieschke and Pinedo conducted an unrecorded interview of Estrada from

11:00 to 11:30 p.m. *Id*. at ¶¶ 52-54. The North Regional Major Crimes Task Force interviewed witnesses that evening as well, investigated the scene for evidence, and determined that the gunshots were fired from an area south of where Orozco was at the time. *Id*. at ¶¶ 42-43. Forensic testing later confirmed that the fatal gunshot was fired from south to north. *Id*. at ¶ 119.

Detectives Oropeza and Connolly interrogated Sánchez a second time from 2:50 to 3:20 in the early morning of May 2, 2013. *Id*. at ¶ 47. Again, they did not provide *Miranda* warnings or video-record the interview. *Id*. at ¶¶ 47-48. Detectives Bieschke and Kopecky conducted a second unrecorded interview of Flores from 3:36 to 5:04 a.m, *id*. at ¶¶ 49-51, and a second unrecorded interview of Estrada from 6:00 to 7:20 a.m., *id*. at ¶¶ 52-54.

At some point that morning, the Wheeling officers and Detective Bush agreed among themselves to charge Sánchez with Orozco's murder. *Id*. at ¶ 56. Despite knowing that the evidence did not implicate Sánchez, the officers agreed to "coerce [Sánchez] into giving a false statement that he shot and killed Rafael Orozco … [and to] coerce [Estrada] and [Flores], and if necessary other witnesses, to falsely state the same or, in the alternative, have them provide false corroborating incriminating statements … ." *Id*. at ¶¶ 56-61. To advance their plan, the officers used a presumptive gunshot residue test—which they knew or should have known was inaccurate and unreliable—on Sánchez's, Estrada's, and Flores's hands. *Id*. at ¶¶ 61-63. The officers claimed that Sánchez's hands tested positive for gunshot residue, and they used that claim to prompt Sánchez and his alibi witnesses to falsely incriminate him. *Id*. at ¶¶ 64-65.

Officers began video-recording Sánchez in the interrogation room at 6:44 that morning. *Id*. at ¶ 66. Detectives Oropeza and Bush interrogated Sánchez from 7:54 to 9:17 a.m. *Id*. at ¶ 68. Sánchez was provided his *Miranda* rights in writing and was asked to read them, but he did not sign the *Miranda* waiver form. *Id*. at ¶ 69. Sánchez denied any role in Orozco's murder.

3

*Id*. at ¶¶ 70-71. However, using psychological and physical coercion, engaging in deception, and denying Sánchez the right to end the interrogation, Detectives Oropeza and Bush "forced [Sánchez] to give inculpatory statements which they fabricated, in which he acknowledged that he shot and killed … Orozco." *Id*. at ¶ 72.

Detectives Oropeza and Bush knew that Sánchez's statement was false and inconsistent with other evidence, so they returned at 9:52 a.m. to coerce him to alter his statement to be more consistent with the other evidence. *Id*. at ¶¶ 74-75. They again used psychological and physical coercion and denied Sánchez the right to end the interrogation or to see his mother or a lawyer. *Id*. at ¶ 76.

The same morning, Flores was transported to the Glenview Police Department, where he was interrogated for several hours by Detective Bieschke. *Id*. at ¶¶ 78-79. Detective Bieschke suggested stories to Flores inculpating Sánchez, lied about evidence, and coerced Flores into implicating Sánchez in the shooting. *Id*. at ¶¶ 79-80. Detective Bieschke knew that Flores's statements, which he "coerced and fabricated," were false. *Id*. at ¶ 81. During another interrogation the following day, May 3, Detectives Bieschke and Bush coerced Flores to again falsely implicate Sánchez. *Id*. at ¶¶ 82-83.

In the meantime, on May 2, officers falsely arrested Scheffler, then nineteen years old, and Rubio, then eighteen years old, to attempt to coerce from them statements that falsely implicated Sánchez in the shooting. *Id*. at ¶¶ 84-85. Scheffler and Rubio were interrogated on May 2 and May 3. *Id*. at ¶¶ 86-114. Scheffler's family members were not allowed to speak with him, and two non-party officers "repeatedly called him a liar, lied and misled him about the evidence, threatened him and fed him facts until he cried and broke down, and he eventually regurgitated the … Officers' fabricated, false narrative … ." *Id*. at ¶¶ 89-91. During his

4

interrogation of Rubio on May 3, Detective Pinedo and a non-party officer "threatened her, lied to her about what other witnesses had related, and continually suggested fabricated accounts of the murder in which [Sánchez] was implicated," *id*. at ¶ 112, until she falsely implicated Sánchez, *id*. at ¶¶ 109-114.

"[B]ased on the coerced and fabricated statements taken by the Defendant Officers of [Sánchez] and his alibi witnesses," Sánchez was charged with the first-degree murder of Orozco. *Id*. at ¶¶ 120-121, 132. Sánchez remained in custody during pretrial proceedings and through trial. *Id*. at ¶ 124. Although standard gunshot residue detection tests did not detect residue on Sánchez's, Flores's, or Estrada's hands or clothes or in Scheffler's car, *id*. at ¶ 126, and although no physical evidence linked Sánchez to the crime, *id*. at ¶ 125, a jury convicted Sánchez of Orozco's murder, and he was sentenced to forty-five years in prison, *id*. at ¶¶ 141-142.

The Appellate Court of Illinois reversed Sánchez's conviction on April 10, 2018. Doc. 1 at ¶¶ 4, 144; *see People v. Sanchez*, 103 N.E.3d 529 (Ill. App. 2018). The appellate court ruled that Sánchez's confession "was involuntary and unreliable, that the 'police pressured the statement out of [him],' and that the statement was illegally obtained without informing him of his right to an attorney." Doc. 1 at ¶ 4; *see also id*. at ¶¶ 144-148; *Sanchez*, 103 N.E.3d at 542-43. The appellate court proceeded to find that the evidence showed that Sánchez was not the shooter. Doc. 1 at ¶¶ 4, 145; *see Sanchez*, 103 N.E.3d at 544-45 ("The evidence convincingly shows that Sanchez did not murder Orozco."). Sánchez was released from custody on April 17, 2018. Doc. 1 at ¶ 150. "On November 6, 2018, the Circuit Court of Cook County found, pursuant to 735 ILCS 5/2-702, that [Sánchez] was innocent of the charges for which he was convicted and granted him a Certificate of Innocence." *Id*. at ¶ 152.

**Discussion**

The complaint alleges under 42 U.S.C. § 1983 that the defendant officers deprived Sánchez of a fair trial and caused his wrongful conviction in violation of the Fourth and Fourteenth Amendments (Count I), subjected him to a coercive interrogation in violation of the Fifth Amendment and the Fourteenth Amendment's Due Process Clause (Count II), wrongfully detained him in violation of the Fourth Amendment (Count III), and maliciously prosecuted him in violation of the Fourth and Fourteenth Amendments (Count VI); that the officers were aware of those violations but did not intervene (Count IV); and that the officers conspired to violate his constitutional rights (Count V). Doc. 1 at ¶¶ 156-181. The complaint alleges state law claims against the defendant officers for malicious prosecution (Count VII); violation of Article II, § 10 of the Illinois Constitution (Count VIII); intentional infliction of emotional distress ("IIED") (Count IX); and conspiracy (Count X). *Id.* at ¶¶ 182-197. And the complaint alleges that the Village of Wheeling and City of Evanston have *respondeat superior* liability and must indemnify their respective officers under 745 ILCS 10/9-102 (Counts XI-XIV). *Id.* at ¶¶ 198-205.

**I.   Count I**

In Count I, Sánchez claims that the defendant officers "violated his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourth and/or Fourteenth Amendments to the U.S. Constitution." *Id.* at ¶ 159. Evanston Defendants argue that "to succeed on [this] claim … , [Sánchez] must show [Detective Bush] violated the rule articulated in *Brady v. Maryland*, 373 U.S. 83 … (1963)." Doc. 49 at 9. And citing *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006), they submit that the complaint's allegations do not make out a *Brady* violation because "[Sánchez] knew from the beginning that … Bush allegedly manufactured evidence and lied about his actions … . [and a]n officer has no duty to disclose to a plaintiff what he already knew." Doc. 49 at 9-10.

6

This argument fails because *Sornberger* speaks only to part of Count I. Count I alleges that Bush (and the Wheeling officers) withheld "the facts of the unrecorded interrogations of [Sánchez] and other witnesses." Doc. 1 at ¶ 158. True enough, the officers' withholding from Sánchez facts regarding *his own* interrogation would not violate *Brady*. *See Sornberger*, 434 F.3d at 1029 (holding that because the plaintiff "knew herself what occurred during the interrogation, … the police were under no *Brady* obligation to tell her again that they coerced her into confessing"). But *Sornberger* does not impact the allegation that the officers withheld from Sánchez facts concerning the unrecorded interrogations of *other* witnesses, as the pleadings do not establish he knew what happened during those interrogations. *See Avery v. City of Milwaukee*, 847 F.3d 433, 443-44 (7th Cir. 2017) (distinguishing *Sornberger* where the plaintiff "knew the informants' statements were false, but he did *not* know about the pressure tactics and inducements the detectives used to obtain them" because the "material question is whether [the plaintiff] was aware of *the impeachment evidence*"). In addition, *Sornberger* does not impact the allegation in Count I, cognizable as a *Whitlock* due process evidence fabrication claim, *see Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)), that the officers "construct[ed] and/or fabricat[ed] [Sánchez's] false and unreliable confession and the incriminating statements of" others, Doc. 1 at ¶ 158.

Evanston Defendants next argue that Bush is entitled to qualified immunity on the *Whitlock* claim because, even if he "used coercive interview techniques," the law did not clearly establish at the time that coerciveness alone could amount to such a claim. Doc. 49 at 8-9. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

7

which a reasonable person would have known. … A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotation marks omitted). "Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Id.* at 548 (internal quotation marks omitted); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) ("[W]e have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the notice pleading requirements of Rule 8.") (citations omitted). This general rule is not ironclad, as there is "tension at [the pleading] stage … between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Reed*, 906 F.3d at 548; *see also Gill v. City of Milwaukee*, 850 F.3d 335, 340-42 (2017) (affirming a dismissal under Rule 12(c) on qualified immunity grounds). The upshot is that a defendant asserting qualified immunity at this stage is subject "to a more challenging standard of review than would apply on summary judgment," and "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *Reed*, 906 F.3d at 549 (internal quotation marks omitted).

There is no basis to depart from the general rule here. Sánchez alleges conduct beyond coerciveness, including that Bush and other officers fabricated evidence that was used to convict him, Doc. 1 at ¶¶ 72, 83, 158, and the law was clearly established in May 2013 that such conduct violates due process. *See Whitlock*, 682 F.3d at 580 (noting that the Seventh Circuit "ha[d] consistently held that a police officer who manufactures false evidence against a criminal

8

defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way"); *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (holding that the defendant police officer's fabrication of evidence "violate[d] clearly established constitutional rights"). It therefore would be premature to dismiss the *Whitlock* portion of Count I on qualified immunity grounds.

## II.     Count II

In Count II, Sánchez claims that the defendant officers violated his "Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law" by "denying [him] his *Miranda* rights and coercively interrogating [him] and causing him to make false and fabricated admissions," which were introduced against him at his criminal trial. Doc. 1 at ¶¶ 163-166. Sánchez alleges that the officers knew that his coerced statements "were false and inconsistent with the physical evidence and statements from eyewitnesses," *id.* at ¶ 74, including forensic evidence showing that the gunshots were not fired from where he was at the time, Doc. 56 at 21. He also alleges that the officers refused his requests to see and speak with his mother. Doc. 1 at ¶ 72.

Evanston Defendants seek qualified immunity for Detective Bush, arguing that the right at issue was not clearly established. Doc. 49 at 4-9. To avoid qualified immunity, Sánchez must show that the right was clearly established "in a particularized sense, rather than at a high level of generality." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011) (explaining that qualified immunity is overcome only if "[t]he official … [had] 'fair warning' [from precedent] that his conduct [was] unconstitutional") (quoting *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002)).

9

"The Due Process Clause of the Fourteenth Amendment forbids the use of an involuntary statement against a criminal defendant." *Janusiak v. Cooper*, 937 F.3d 880, 888 (7th Cir. 2019); *see Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) ("The Fourteenth Amendment makes the Fifth Amendment's Self-Incrimination Clause applicable against the States. … [It is violated] by using coerced confessions at pre-trial hearings or trials in criminal cases."). The voluntariness of a defendant's confession depends on the totality of the circumstances. *See Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018), *overruled in part on other grounds by Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2018). In arguing that the defendant officers' actions were coercive and elicited involuntary statements in violation of clearly established law, Sánchez persuasively aligns the facts here with those of two precedents in effect at the time of the interrogations.

First, he argues that the officers' repeated denials of his requests to speak with his mother rendered his statements involuntary under *Haynes v. Washington*, 373 U.S. 503, 514 (1963). Doc. 56 at 18-21. Evanston Defendants retort that "it was not clearly established [in *Haynes*] that denying [Sánchez] the opportunity to contact his mother under the specific circumstances facing Bush violated [Sánchez's] constitutional rights." Doc. 61 at 3-4. Although the facts in *Haynes* differ in some respects from those here, *Haynes* clearly establishes that the officers' (alleged) refusal of Sánchez's repeated requests to call his mother, and their telling him that he could not call her until he changed his story, rendered his statements involuntary in violation of the Fourteenth Amendment. *See Haynes*, 373 U.S. at 514 ("Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family Haynes understandably chose to make and sign the damning written statement; given the unfair and inherently coercive context in which made, that choice cannot be said to be the voluntary product of a free and unconstrained will, as required by the Fourteenth

10

Amendment."). Indeed, the state appellate court in Sánchez's criminal appeal held that "on the issue of voluntariness, we cannot distinguish this case from *Haynes* … ." *Sanchez*, 103 N.E.3d at 540-41.

Second, Sánchez argues the Detective Bush knowingly coerced his false confession in violation of the principle reiterated in *Hurt*, which held that "if a trier of fact could conclude that the officers knew that the confession[] [was] false, then the officers are not entitled to qualified immunity." 880 F.3d at 847-48. Evanston Defendants respond that *Hurt* could not have given Bush "fair notice … that his alleged conduct was unlawful" because it was decided years after the interrogations. Doc. 61 at 6-7. But Sánchez does not cite *Hurt* as establishing the rule that clearly established the unlawfulness of Bush's conduct; rather, *Hurt* is a qualified immunity case holding that that "[t]he rule forbidding [deliberately coercing a confession] ha[d] been established for decades," and thus was clearly established at the time of the interrogation. 880 F.3d at 848.

Evanston Defendants also contend that the videotape of the interrogation fatally undermines Sánchez's central allegation that "his confession contained facts fed to him by the officers." Doc. 61 at 5 & n.4. As an initial matter, it is doubtful that video evidence outside the pleadings can be deployed to dismiss a claim under Rule 12(b)(6) where, as here, the complaint alleges facts sufficient to support the claim. *See Jackson*, 888 F.3d at 263-64 ("The district court declined to review the interrogation video to make factual determinations about the officers' alleged intimidation tactics and [the plaintiff's] demeanor. Instead, the district court did what district courts normally should do at this stage: it accepted all well-pleaded factual allegations in the complaint as true, drew all reasonable inferences in favor of [the p]laintiff, and determined whether the claims plausibly suggest entitlement to relief. Generally, a district court cannot

11

consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment."). In any event, drawing all reasonable inferences in Sánchez's favor, the court cannot say that the video conclusively defeats his allegations of coercion. *See id*. at 264 ("The officers … claim the video shows they did not use any single tactic, or combination of tactics, that were clearly unconstitutional. But … the video is bound to be subject to varying interpretations. … The officers want to spin the facts shown by the video. [But] they do not account for the fact that the video does not show everything. … And what it does show is open to interpretation.").

Like Evanston Defendants, Wheeling Defendants seek qualified immunity for Detectives Connolly and Oropeza on the ground that "the law at the time of the alleged violations of the Fifth Amendment was not clearly established." Doc. 47 at 5-6. Specifically, Wheeling Defendants contend that *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017), and *Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017), "demonstrate that Oropeza [and Connolly] … could not have had clear notice that [their] actions when questioning [Sánchez] violated clearly established [Fifth] Amendment [law]." Doc. 47 at 10. This contention fails to persuade.

The plaintiff in *Gill* alleged that he was particularly susceptible to interrogation tactics due to his intellectual disability. The Seventh Circuit held that the defendant detectives were entitled to qualified immunity because the plaintiff did not cite, and the Seventh Circuit could not find, "any precedent from the Supreme Court or this Circuit that puts the unconstitutionality of the officers' conduct … 'beyond debate,'" and the plaintiff did not distinguish a "closely similar" Seventh Circuit case holding that using ordinary interrogation tactics on a cognitively disabled individual did not violate due process. 850 F.3d at 341 (quoting *Mullenix*, 136 S. Ct. 308). *Gill* does not help Detectives Connolly and Oropeza. Because "[w]hether interrogation tactics are

unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances in a particular case," *ibid*., and because Sánchez alleges facts that align this case with the circumstances in *Haynes* and *Hurt*, the defendant officers are not entitled to qualified immunity at the pleading stage.

In *Dassey*, the Seventh Circuit held on federal habeas review that it could not conclude that the state court unreasonably applied Supreme Court precedent in ruling that the petitioner's confession was voluntary where the officers asked leading and suggestive questions, falsely told the petitioner that they knew what had happened, and provided false assurances of leniency. 877 F.3d at 312-313 ("Under AEDPA, the essential point here is that the totality-of-the-circumstances test gives courts considerable room for judgment in cases like this one, where the factors point in both directions. … [T]he state court's decision was not an unreasonable application of Supreme Court precedent."). *Dassey* is inapposite, as the qualified immunity standard differs from the standard applied on federal habeas review. *See Hurt*, 880 F.3d at 846 ("[In *Dassey*, w]e ruled that the demanding standard set by 28 U.S.C. § 2254(d) had not been met. The present case, a civil one under 42 U.S.C. § 1983, involves no such deference to the … defendants' position; to the contrary, at this stage we must give the plaintiffs the benefit of the doubt.") (citation omitted). In any event, the plaintiff in *Dassey* had been subject to an interrogation with frequent breaks, with his mother's knowledge and consent, in a comfortable setting; had showed no signs of physical distress; and "was not … pushed to provide a false story against his will." *Dassey*, 877 F.2d at 312-13. Here, by contrast, Sánchez alleges that he was pushed to tell a false story and prevented from talking with his mother. Doc. 1 at ¶¶ 2a, 4, 71-72, 146. At this stage of the litigation, Sánchez has alleged facts sufficient to avoid qualified immunity.

**III. Count III**

In Count III, Sánchez claims that Detective Bush "caused [him] to be unreasonably seized, detained, imprisoned and deprived of his liberty without probable cause to believe he had committed a crime, in violation of his rights secured by the Fourth Amendment." Doc. 1 at ¶ 168. Evanston Defendants challenge this claim only on the ground that Bush is entitled to qualified immunity on all federal claims alleging that he engaged in coercive interview techniques. Doc. 49 at 3-9. With qualified immunity on those claims having been rejected, Count III survives dismissal.

**IV. Counts IV and V**

In Counts IV and V, Sánchez claims, respectively, that the officers were aware of the constitutional violations being committed and failed to intervene, and that they conspired to deprive him of his constitutional rights. Doc. 1 at ¶¶ 170-176. Evanston Defendants argue that the failure to intervene and conspiracy claims should be dismissed because the underlying constitutional claims should be dismissed. Doc. 49 at 11. Because the underlying claims survive dismissal, that argument fails.

Evanston Defendants next argue that the failure to intervene claim against Detective Bush should be dismissed because he was not present during any unrecorded interview. *Id*. at 10. That argument is unpersuasive. Insofar as Detective Oropeza committed constitutional violations in Detective Bush's presence, Sánchez plausibly alleges that Bush had a duty to intervene and failed to do so. Doc. 1 at ¶ 171; *see* Doc. 56 at 26-27. Moreover, Sánchez's allegations yield the reasonable inference that Detective Bush had the opportunity to intervene throughout, as he was engaged in the investigation early on, Doc. 1 at ¶ 44, and was present and interrogating witnesses at about the same time as the other interrogations, *id*. at ¶¶ 68-83. That is sufficient to support a failure to intervene claim at the pleading stage. *See Abdullahi v. City of*

14

*Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*.") (internal quotation marks omitted).

In seeking dismissal of the conspiracy claim, Wheeling Defendants contend that Sánchez "provides no factual detail as to how [he] knew the investigators had concocted such an elaborate scheme," that he has no "basis for insights into the officers' state of mind," and that the complaint "consists of conclusory and speculative allegations." Doc 47 at 11-12. "To establish conspiracy liability in a § 1983 claim, the plaintiff must [allege] that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id*. at 511. There is no heightened pleading standard for conspiracy claims: "[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002); *see also Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009) (discussing *Twombly*/*Iqbal* and citing *Walker* with approval).

Sánchez has stated a viable conspiracy claim. The complaint identifies the parties to the conspiracy, the defendant officers, Doc. 1 at ¶¶ 56, 175-176; the general purpose of the conspiracy, to coerce Sánchez's and witness's false statements with the goal of ensuring that he would be charged and convicted, *id*. at ¶¶ 56-57, 63-65, 85, 153, 175-176; and the approximate dates of the conspiracy, the immediate aftermath of the May 1, 2013 shooting, *id*. at ¶¶ 56, 63.

15

These allegations give sufficient notice of the contours of the conspiracy claim, and no greater specificity is required to survive a motion to dismiss. *See Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (holding that the district court erred in ruling that "a claim of conspiracy must be pleaded with specificity") (brackets and internal quotation marks omitted).

In pressing the opposite result, Wheeling Defendants cite *Cooney* for the proposition that "[a] bare allegation of conspiracy is not enough to survive a motion to dismiss." Doc. 47 at 11. The plaintiff in *Cooney* claimed that her children's representative had "orchestrated" a plot with others to deprive her of custody, and she sued them all for conspiracy under § 1983. 583 F.3d at 969-70. The Seventh Circuit affirmed the claim's dismissal, reasoning that the complaint was "bereft of any suggestion, beyond a bare conclusion, that the … defendants were leagued in a conspiracy," and that "[n]o factual allegations tie the defendants to a conspiracy with a state actor." *Id*. at 971. *Cooney* is inapposite. Given what the state appellate court described as the "overall implausibility" of the case against Sánchez, *Sanchez*, 103 N.E.3d at 544, and the role the defendant officers played in the investigation, it can be reasonably inferred at the pleading stage that the officers conspired to deprive Sánchez of his constitutional rights. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion.").

## V.     Count VI

In Count VI, Sánchez alleges malicious prosecution under § 1983. Doc. 1 at ¶¶ 177-181. In so doing, he candidly "recognizes that the Seventh Circuit … has held that there is no cause of action for malicious prosecution under 42 U.S.C. § 1983, under either a Fourth or a Fourteenth [A]mendment theory," and explains that he included the "count in order to preserve this issue for

potential review." *Id*. at p. 28 n.1. Sánchez is correct that, under prevailing law, there is no § 1983 claim for malicious prosecution. *See Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) ("[T]here is no such thing as a constitutional right not to be prosecuted without probable cause.") (alteration in original) (internal quotation marks omitted). Count VI accordingly is dismissed with prejudice.

## VI. Count IX

In Count IX, Sánchez claims that the officers intentionally inflicted emotional distress on him. Doc. 1 at ¶¶ 189-193. Defendants contend that the IIED claim is untimely under the applicable one-year statute of limitations, 745 ILCS 10/8-101. Doc. 47 at 12-14; Doc. 49 at 12-13. The premise underlying Wheeling Defendants' position is that the claim accrued by December 8, 2014, the date of Sánchez's sentencing, more than four years before he filed suit on April 10, 2019. Doc. 47 at 13. The premise of the Evanston Defendants' position is that the claim accrued on May 2, 2013, the date Detective Bush interrogated Sánchez. Doc. 49 at 12. Sánchez invokes the *Heck* doctrine for the proposition that his IIED claim did not accrue until his conviction was reversed on April 10, 2018. Doc. 56 at 28-30. In their reply briefs, Defendants do not dispute that the IIED claim is timely if it accrued on April 10, 2018. Doc. 60 at 12-13; Doc. 61 at 10.

"[T]he Illinois judiciary has adopted *Heck* for claims arising under Illinois law." *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 803 (N.D. Ill. 2013) (citing *Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1107-08 (Ill. App. 2011)). "Under the *Heck* framework, a claim that directly attacks the validity of a conviction cannot accrue until after the conviction has been terminated in a manner favorable to the plaintiff." *Parish v. City of Elkhart*, 614 F.3d 677,

681 (7th Cir. 2010). The question, then, is whether Sánchez's IIED claim directly attacks the validity of his conviction. It does.

The IIED claim alleges that the defendant officers coerced Sánchez's confession, fabricated details of his confession and other witness statements, "procur[ed] his prosecution, conviction, and sentence of imprisonment for a murder he did not commit by means of the false and fabricated confession, witness statements and evidence," and covered up their actions through trial and beyond. Doc. 1 at ¶¶ 190-191. The IIED claim further alleges that, as a result of the defendant officers' conduct, Sánchez "experience[d] severe emotional distress, including fear of spending the majority of his life in prison, nightmares, disruption of his sleep, symptoms of post-traumatic stress disorder, anxiety, depression, and inability to focus or concentrate." *Id*. at ¶ 193. Given its factual predicate, the IIED claim "was not complete prior to the time of conviction because the conviction was the crux of the case," as the officers "allegedly took steps through all stages of the investigation and trial that cumulatively amounted to the tort of IIED" and "the conviction was an essential piece of this tort because it was the wrongful conviction that led to the emotional strain and mental anguish that [Sánchez] faced." *Parish*, 614 F.3d at 683. The IIED claim therefore directly attacks the validity of his conviction, which means under *Heck* that it did not accrue until the conviction was reversed.

### VII. Counts VIII and X

Wheeling Defendants argue that Count VIII, which alleges a violation of the state constitutional provision against compelled self-incrimination, Doc. 1 at ¶¶ 187-188, and Count X, which alleges state law conspiracy, *id*. at ¶¶ 194-197, should be dismissed as duplicative of, respectively, Counts II and V, which are the federal analogs of those state law claims. Doc. 47 at 14-15. In support, Wheeling Defendants cite *Barrow v. Blouin*, 38 F. Supp. 3d 916, 920 (N.D. Ill. 2014), for the proposition that courts should dismiss "duplicative claims if they allege the

same facts and the same injury." Doc. 47 at 14. Aside from being nonprecedential, *Barrow* is inapposite. In holding that "[c]laims that involve the same operative facts and same injury, and that require proof of essentially the same elements, are duplicative as opposed to alternative," the court was addressing two federal constitutional claims, "a Fourth Amendment false arrest claim [and] a Fourth Amendment unreasonable seizure claim." 38 F. Supp. 3d at 920. *Barrow* does not speak to whether a plaintiff can pursue a federal claim and an analogous state law claim based on the same facts.

## VIII. State Law Claims

Finally, Evanston Defendants contend that the court should "decline to exercise its supplemental jurisdiction" over Sánchez's state law claims if his federal claims are dismissed. Doc. 49 at 13. Because Sánchez's federal claims survive, the court has supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367(a).

## Conclusion

Defendants' motions to dismiss are granted in part and denied in part. Sánchez's § 1983 malicious prosecution claim (Count VI) is dismissed with prejudice. His other claims may proceed.

January 30, 2020

_____
United States District Judge