**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JESÚS SÁNCHEZ,** | ) | |
| | ) | **No:    1:19-cv-02437** |
| | ) | |
| | ) | |
| | ) | **Judge  John F. Kness** |
| | ) | |
| **THE VILLAGE OF WHEELING, et al.,** | ) | **Magistrate Judge Kim** |
| | ) | |
| Defendants. | | |

**SECOND DECLARATION OF DR. DIANA S. GOLDSTEIN**

I, DIANA S. GOLDSTEIN, PH.D., ABPP, declare as follows**:**

1.      This declaration is offered pursuant to this Court's order requesting that I explain "how a Rule 35 examination in 2022 may assist [me] to better evaluate Mr. Sanchez's psychological condition and vulnerabilities in 2013."  (Dkt. 202).

2.      I intend to examine Mr. Sanchez as to both his claimed psychological damages as well as his claim that his psychological attributes and vulnerabilities made him susceptible to involuntarily and falsely confessing as a result of the detectives' interrogation of him on May 2, 2013.

3.      As to Mr. Sanchez's purported psychological attributes and vulnerabilities in 2013, Plaintiff's expert, Richard Leo, Ph.D., opined generally that certain individuals are more vulnerable to the pressures of interrogation, including those with intellectual disabilities, low IQ or low-level cognitive abilities, mental illness, individuals under the age of 18, and those with certain personality traits that predispose them to compliance.  (Dkt. 201, Ex. 1, p. 14-15).   As to Mr. Sanchez, Dr. Leo opined generally that he had "weak and vulnerable personality traits and characteristics," and emphasized that Mr. Sanchez was 18 years old at the time and was extremely tired and exhausted during the interrogation.  *Id*. at p. 69-70.  But Dr. Leo did not examine Plaintiff, nor did he review Plaintiff's deposition transcript, obtained December 16, 2021.  Rather, Dr. Leo frames his opinions

around a series of "risk factors" that he opines can lead to false confessions. As a boarded clinical psychologist and neuropsychologist, I will examine Plaintiff as an individual. With an individual examination, I can assess whether, and to what extent, the generalities Dr. Leo references applied to Mr. Sanchez.

4.     In that regard, the fact that Plaintiff experienced the police interrogation in 2013, as opposed to more recently, does not impact the examination or analysis. First, the clinical interview will be a valuable source of information, both as to his life experiences leading up to and including that time frame as well as his actual experiences during the interrogation. Second, while I have been provided Plaintiff's deposition transcript, a lawyer's questions regarding a wide range of topics subject to the rules surrounding a deposition are not an adequate substitute for a clinical examination. I have been trained to conduct clinical examinations that permit diagnoses and history gathering dating back to early developmental years, as well as the manner in which developmental, intellectual, psychiatric, cognitive and substance use disorders, or other personal circumstances or trauma, have impacted an individual's functional capacities, life experiences, attitudes and beliefs, and personality formation. The information I learn from a clinical examination will inform my opinions regarding Mr. Sanchez's psychological attributes and cognitive status at the time of his interview as well as his particular vulnerabilities, if any. Indeed, all of the Rule 35 exams I have conducted have occurred after the event precipitating the lawsuit. I am similarly called upon regularly in criminal matters to conduct competency examinations regarding a waiver of rights under *Miranda*, all of which are, by their nature, retrospective inquiries, many of which occur numerous months, if not years, after initial interrogations.

5.     Additionally, and related, Plaintiff's deposition was conducted before Dr. Leo provided Defendants with his expert report on December 21, 2021. Thus, at that time of Plaintiff's deposition, the lawyers did not have Dr. Leo's opinions and supporting documentation to guide their questioning of Plaintiff, even to the extent they could without clinical psychological training or the time to inquire

comprehensively into Plaintiff's clinical history and life experiences. With an individual examination, I can explore the particular risk factors Dr. Leo identifies regarding the susceptibility of individuals generally, and Plaintiff specifically, and provide opinions regarding points of agreement with and/or rebuttal of Dr. Leo's opinions.

6.     Additionally, while Dr. Leo opines that certain risk factors may have contributed to Mr. Sanchez confessing falsely and involuntarily, false confession theories like his are not universally accepted in the academic literature, or by the Courts, and Dr. Leo himself acknowledges such risk factors are not dispositive of all false confessions. His research describes *risk* factors, not causal factors, and does not portend to explain all cases. Moreover, the social science research into false confessions is relatively new from an empirical perspective, there are significant weaknesses in the experimental research on which it relies for evidentiary support, and new theories and frameworks by other researchers continue to be posited. I intend to discuss the status and weaknesses of this empirical literature and the inherent problem of attempting to apply it reliably to a specific individual in my report and, if permitted to examine Mr. Sanchez, to address whether, or to what extent, Dr. Leo's identified risk factors played any role in the experiences of Mr. Sanchez during the May 2, 2013 interrogation. In this regard, an examination is critical to potentially rebutting Dr. Leo's opinions.

7.     Moreover, from my review, a central component of Dr. Leo's opinion is that Mr. Sanchez's psychological attributes and vulnerabilities limited his ability to fully understand the interrogation process and contemplate the consequences of his actions, putting him at risk for providing an allegedly false confession. For that reason, I intend to conduct a comprehensive neurocognitive examination of Mr. Sanchez to assess his intellectual and other cognitive abilities. The fact that his interrogation occurred in 2013 will not impact the analysis because intellectual and cognitive abilities remain static throughout one's life barring any neurologic insult or the onset of age-related decline or neurodegenerative disease, factors not relevant in Mr. Sanchez's case. Available longitudinal research

also shows that the experience of long-term incarceration does not result in significant changes in cognitive functioning relative to baseline levels.

8. As to his claim of psychological damages, it is my understanding that Mr. Sanchez claims he suffers psychological damages that persist *today*. In that regard, the passage of time since Mr. Sanchez's interrogation is no barrier to my examination. I intend to explore with him the suffering of which he complains, which I understand to include "severe emotional distress, including fear of spending the majority of his life in prison, nightmares, disruption of his sleep, symptoms of post-traumatic stress disorder, anxiety, depression, and inability to focus or concentrate." (Dkt. 1, Pl. Compl., ¶ 193). Claims of significant impairments in concentration provide yet further basis for the proposed neurocognitive examination.

9. Finally, an assessment of malingering is standard practice in forensic examinations due to the high rates of malingering in criminal and civil matters documented in the empirical literature. Failure to assess for malingering during a forensic examination is in fact considered falling short of good practice. I intend to examine whether malingering plays a role in any aspect of Mr. Sanchez's claim of psychological damages, or in his claim of having been coerced into confessing. If malingering is an issue, it would be one that continues until this day, making Mr. Sanchez's participation in a current examination highly relevant to my analysis.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 24, 2022 at Chicago, Illinois

Diana S. Goldstein, Ph.D., ABPP
Licensed Clinical Psychologist
IL #071-006006