**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JESÚS SÁNCHEZ, | ) | |
| | ) | No: 1:19-cv-02437 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge   John F. Kness |
| | ) | |
| THE VILLAGE OF WHEELING, et al., | ) | Magistrate Judge Kim |
| | ) | |
| Defendants. | ) | |

# Exhibit 75

Matt Jones's Report

December 30, 2021

Ben Elson, Joey Mogul
People's Law Office
1180 N. Milwaukee
Chicago, IL 60660

Amanda S. Yarusso
111 W. Washington Street, Ste. #1500
Chicago, Illinois 60602

Re: Sanchez v. Village of Wheeling, et al.

Dear Counsel,

The following report is being presented per your request

**Background Qualifications**

My name is Matt Jones, and I am a twenty-one-year veteran of local law enforcement. I began my career with the Independence Police Department in Ohio in 2000, lateraled to the Phoenix Police Department in 2007 and then to the Tempe Police Department in 2008 where I retired from active service in 2021. During my career, I completed assignments in Patrol, Robbery, and a Criminal Apprehension and Surveillance Team, a task force officer with the U.S. Marshals' Violent Offender Task Force (Arizona District) and ended my career as a detective in a Homicide unit. I have been the case agent on a wide variety of investigations during my career that include burglary, robbery, aggravated assault, weapons offenses, drug related offenses, kidnapping, missing persons, officer-involved shootings, officer misconduct criminal investigations, cold case homicides, suicide, accidental deaths, natural deaths, homicide and have successfully testified in court as part of these investigations. My experience as a homicide case agent entailed processing homicide crime scenes for evidence, interviewing victims, eyewitnesses, suspects, involved officers, and conducting extensive canvas interviews. I have also managed follow-up case tasks on large multi-jurisdiction investigations, to include providing case presentations to attorneys and other involved working groups, completing a wide variety of search warrants, reviewing cellular call detail records, social media account records, and organizing in-state, out-of-state, and out of country fugitive extraditions of homicide suspects.

In 2015, I began assessing the effectiveness of the investigative interview curricula most frequently taught to U.S. local law enforcement. I was subsequently invited to attend a science-based interview training curriculum with the U.S. government's High Value Detainee Interrogation Group (HIG) and successfully completed those courses. Science-based interviewing techniques are best described as interview techniques which are ethical, have been empirically tested and scientifically validated out in the field by social-science researchers under a variety of contexts. During this time, I also began collaborating with the researchers who were conducting these studies into topics related to investigative interviewing such as developing rapport, mitigating resistance, the cognitive interview, eyewitness memory, strategic evidence

disclosure, and assessing the reliability of confessions. I have continued my involvement in these research projects to this day.

Besides participating in research studies, I regularly provide presentations alone or part of a panel at local and international conferences on science-based interviewing and participate in technical working groups assessing and developing new science-based interview curriculum for local, state, and federal agencies. In 2020, I began assisting in training investigators in science-based interviewing and began consulting as a police practices expert on wrongful conviction cases related to potential false confessions.

I have obtained a Bachelor of Arts degree in Political Science/Criminal Justice from the University of Akron and a Master of Arts degree in Forensic Psychology from the University of North Dakota.

**List of Materials I Reviewed**
In preparing this report, I have reviewed the following documents:

- Plaintiff's Complaint
- Appellate Court Opinion, People v. Sanchez, 2018 IL App (1st) 143899
- Motion to Suppress Testimony, People v. Sanchez, Sotos 99 - 119
- Testimony at the Motion to Quash Arrest, People v. Sanchez, Sotos 857 - 992
- Testimony at the Motion to Suppress, People v. Sanchez, Sotos 994 – 1150
- Testimony of Detective Oropeza and Defense Exhibit 12, People v. Sanchez, Sotos 1848 – 1949, Plaintiff Sanchez 15852
- NORTAF Homicide File, Plaintiff Sanchez 007307 - 8270
- NORTAF Homicide File, Plaintiff Sanchez 008271 - 8369
- Handwritten Notes, Wheeling 01405 - 01450
- Lead Sheets, Wheeling 14991 - 15017
- Cook County Medical Examiner's Report, Plaintiff Sanchez 004749 – 4754
- Sanchez Petition for a Certificate of Innocence and Exhibits, Plaintiff Sanchez - 016312 – 017308
- Detective Bieschke, Detective Bush, Sergeant Chirio, Sergeant Connolly, Sergeant Conway, Detective Girard, Detective Kopecky, Detective Oropeza, Detective Pinedo and Detective Conboy's Depositions and Deposition Exhibits
- Transcript and Video of Jesus Sanchez's Interrogation on May 2 and 3, 2013 Sotos 572 – 776
- Transcript of Heladio Flores' Interrogation on May 2 and May 2, 2013, Plaintiff Sanchez 015889 - 016147
- Transcripts of the Interrogations/Interviews of Collin Scheffler, Bryan Estrada, Miguel Cortez, Bradley DeChambre, Edgar Uriel Martinez, Jose Garcia, Leslie Rubio, Scarleth Rodrigues, Plaintiff Sanchez 017873 - 18249
- Maps of the Scene and Area, Wheeling 03292, Wheeling 05327, Wheeling 01710
- Pictures, Plaintiff Sanchez 003819 - 4159, 001243-52, 001258-65

The following evaluation of this investigation was conducted based off of the materials provided to me by the People's Law Office. The conclusions subsequently provided are my own and were not facilitated by anyone else. At no time am I making a determination as to whether Jesus Sanchez or any other individuals in this investigation provided a false confession or statements. I am offering my opinion as to whether the Rafael Orozco murder investigation followed accepted police practices.

**Known Facts**

On May 1, 2013, at approximately 2102hrs, the Wheeling Police Department (WPD) responded to a call for service of a person who had been shot at the Wine Tree Apartment complex at 486 Pleasant Run Drive, Wheeling, IL. Upon arrival, Rafael Orozco was found unresponsive with a suspected gunshot wound. Orozco was subsequently transported to the Glenbrook Hospital and pronounced deceased at approximately 2150hrs.

According to several eyewitnesses, Rafael Orozco was shot and killed while standing in a courtyard in the Wine Tree apartment complex on May 1, 2013 at approximately 2100hrs. At the time, he was standing in a circle with Miguel Cortez, Martin Cortez-Alvarez, Edson Calleros, Jose Garcia and Michael Crost near a streetlight. Orozco was standing near the northwest corner of building 486 Pleasant Run Drive, at the south end of the circle with his back to Equestrian Drive and he was facing north. The report from the medical examiner indicates that Rafael Orozco was killed by a gunshot wound to the back. This would indicate he was shot by someone from south of his location.

According to reports from eyewitnesses and the physical evidence recovered from the scene by evidence technicians, the shot that killed Rafael Orozco came from the south and was heading in a northern trajectory. On 05/01/13 at approximately 2340hrs, Det. S. Ferguson and Det. Roscoe interviewed Miguel Cortez at WPD with the permission of his father Martin Cortez-Alvares. Miguel Cortez stated that earlier in the evening at approximately 2100hrs, he was standing in the courtyard under an overhead courtyard light with Rafael Orozco, Jose Garcia, Mike Crost, Edson Calleros and Martin Cortez-Alvares when he heard three shots possibly coming from the south, off Equestrian Drive. Miguel stated Orozco was facing north with his back to Equestrian Drive when the shots were fired. Miguel did not recall seeing anyone in the area of where the shots were fired or a muzzle flash of any kind. This was the first eyewitness statement obtained indicating the shots potentially were fired from south to north.

On 05/01/13 at approximately 2350hrs, Det. DeClet and Det. Glad interviewed Wine Tree resident Jose Garcia at the WPD. Garcia stated he was standing in front of 486 Pleasant Run Drive when he heard the seven shots fired that he believed were fired from south of his location. This was the second eyewitness statement indicating the shots were potentially fired from south to north.

On 05/01/13 at approximately 2352hrs, Det. Oropeza and Det. Levy interviewed Wine Tree resident Martin Cortez-Alvares of 484 Pleasant Run Drive, #2B at the WPD. Cortez-Alvares stated that shortly after 2045hrs, he was outside speaking with his son, Miguel Cortez, his son's friend, Edson Calleros, Rafael Orozco (Cholo) and three other subjects who were with Orozco in the area of an outdoor streetlamp outside of 484 Pleasant Run Drive. This location is just north of

Equestrian Drive. Cortez-Alvares stated they were speaking for approximately 15-20 minutes when he heard 5-6 gunshots emanating from the area just south of them and turned around in time to see muzzle flashes from one specific location south of them. Cortez-Alvares believed there was only one shooter. Upon hearing the shots, the group fled east to another building where Orozco collapsed and became unresponsive. This is the third eyewitness interview of a possible trajectory for the location of the shots being fired from south to north. This information would indicate the shooter as likely being situated in an area on or just north of Equestrian Drive, south of the courtyard area where Orozco was standing when he was shot.

On 05/02/13 at approximately 0005hrs, a fourth eyewitness was located and interviewed which also identified the shots potentially emanating from south to north. Det. Connolly and Det. Girard interviewed Danielle Pettibone at the WPD. Danielle stated she was sitting outside on the front steps to unit 492 Pleasant Run Drive when she heard the first of several shots. Danielle stated that she believed the shots came from the area of Equestrian Drive which was just south of where she observed the victim standing in the common courtyard area near a light pole.

On 05/02/13 at 1300hrs, Ofc. Wasowicz confirmed that the trajectory of one of the shots fired that had struck a support arm of a satellite dish in the same courtyard where Orozco was shot. This defect tested positive for the presence of lead. The trajectory analysis confirmed that the shot came from south to north. Within the first forty-eight hours of this investigation, there was scene evidence located and four independent eyewitnesses interviewed who had identified the shots emanating from the area on or just north of Equestrian Drive with a trajectory of south to north.

The following detectives and supervisors were among the initial first investigators who arrived on scene who were directly involved in this investigation: Det. Pinedo, Det. Bieschke, Det. Oropeza, Det. Connolly, Sgt. Conway, and Sgt. Chirio. Information was initially obtained on scene that Surenos 13 gang members were chasing Maniac Latin Disciples (MLD) gang members in the area north of 482 Pleasant Run Drive. Sgt. Chirio responded to assist Sgt. Conway and observed Jesus Sanchez and Bryan Estrada being chased by Surenos 13 gang members and other friends of the victim, Rafael Orozco.

According to Sgt. Conway and Sgt. Chirio, Sanchez and Estrada were running towards Sgt. Conway and began to walk once they saw him. Sgt. Conway stated he said to them, "What is going on? Get over here" just before he placed them in handcuffs and sat them down on the grass behind him. Sgt. Conway said the people chasing Sanchez and Estrada were angry and they were saying Sanchez and Estrada might have information as to who committed the shooting, but there was no further information indicating that Sgt. Conway or any other officer asked these individuals as to the basis for their speculation about Sanchez and Estrada's knowledge. Sgt. Conway acknowledged that neither Sanchez nor Estrada had asked for help at this point, and he did not see them commit any violation of the law before detaining them. While Sgt. Chirio also stated that he had no probable cause to believe Sanchez or Estrada had committed a crime, he still directed Det. Oropeza to put Sanchez and Estrada in a squad car while they were still handcuffed. Shortly thereafter, Det. Oropeza removed them from that squad car. Sanchez and Estrada were then frisked, cuffed separately, and placed into the backseats of two separate vehicles to be transported back to the WPD to be interviewed. At the time Sanchez was detained

4

by Sgt. Conway, Sgt. Chirio and Det. Oropeza, he was wearing plaid shorts and a black tank-top shirt.

On 05/01/13 at 2235hrs, Det. Bush and Det. Pinedo interviewed Edson Calleros. Calleros had been identified as one of the subjects standing next to Rafael Orozco when he was shot. Calleros did not observe the shooter. Calleros also stated that on 05/01/13 at approximately 1545hrs, he was confronted by three subjects, Bryan (Bryan Estrada), Kalo (Kaloyan Nedev), and Smokey (Jesus Sanchez), as he exited a school bus. Calleros stated the three subjects started a physical altercation with him just before his mother arrived and the subjects fled the area. A short while later at approximately 1900hrs, there was a second altercation which occurred at the Wine Tree apartment complex when Estrada, Sanchez, and Flores, were observed by Calleros arriving at the complex. Calleros stated he was with Rafael Orozco, Jose Garcia, Miguel Cortez, and Mike Crost when they attempted to chase Sanchez, Estrada, and Flores, but they ran away.

Soon after the initial call of the shooting, WPD Dispatch received a call for service of a subject sneaking through the residential backyards in the area of 1009 Pear Tree Ln (which is the neighborhood just north of the Wine Tree apartments). Sgt. Chirio and Det. Bieschke responded and located Heladio Flores, frightened and out of breath. Heladio stated he was also being chased by Sureno 13 gang members from the area of the Wine Tree apartments. Sgt. Chirio and Det. Bieschke transported Flores back to WPD to be interviewed. It was later determined that Flores is friends with Sanchez and Estrada.

As the post-shooting investigation continued that same evening, several additional eyewitnesses were identified. At approximately 2330hrs, Ofc. J. Hoffman was assisting with securing the area of Equestrian Drive and Paddock Drive, when he was contacted by Volodymyr Motkalyuk of 1265 Paddock Drive. This residence is on the southeast corner of Equestrian Drive and Paddock Drive and the garage faces to the west. Motkalyuk stated that earlier in the evening he was working inside of his garage when he heard 3-5 loud pops. As he walked out, Motkalyuk said he observed a black or dark colored older sedan, possibly a Mazda 323 or Nissan Sentra, traveling at a high rate of speed, with its exterior lights off, westbound on Equestrian Drive from the Wine Tree apartment complex. Motkalyuk stated that as the vehicle continued traveling westbound past Equestrian Park, its exterior lights were turned back on. This was the first report of a potential suspect vehicle seen leaving the scene in close proximity to the shots being fired.

On 05/01/13 at 2259hrs, Det. Bieschke interviewed Bryan Estrada who said that on 04/30/13 he was standing at the entrance to the Wine Tree Apartments when a dark colored 4-door sedan, possibly a Chevy Impala stopped. Two subjects exited the vehicle and punched him in the head and body. Estrada described these subjects as male, Hispanic, 6', in their 20s. Estrada believed they were members of the Lollipop or Piper Spanish Gangster Disciples (SGDs). Det. Bieschke also learned of these men, in their 20s, exiting a dark colored vehicle and punching Estrada at the Wine Tree apartments on 04/30/13 from Heladio Flores when he interviewed him on 05/01/13 at 2337hrs.

At approximately 2345hrs, Det. Pinedo and Det. Bush interviewed resident, Edgar Uriel Martinez, of 482 Pleasant Run Drive at the WPD. Edgar stated that he was standing outside the southwest corner of his apartment around 2100hrs facing to the south when he observed a white

Jeep Cherokee/SUV drive very slowly westbound on Equestrian Drive with its headlights off and that a male Hispanic subject, 6'2", wearing a light blue short-sleeve shirt and white shorts exited the vehicle from the right rear passenger side door. Edgar stated the subject continued to walk westbound on the grass while the vehicle drove next to him. Edgar stated he lost sight of the subject and vehicle due to the building south of him blocking his view. Seconds later, Edgar heard six gunshots. Edgar did not report seeing the subject walking or the vehicle again after hearing the shots. This was the second report of a potential suspect vehicle.

On 05/02/13 at approximately 1207hrs, Leslie Rubio was interviewed by Det. Glad and Det. Levy at the Skokie PD after she was arrested. At approximately 1308hrs, Leslie mentions that she believed the "bullets" came from a dark car, possibly a black or dark older model Malibu. This was the third report of a potential suspect vehicle seen leaving the scene in close proximity to the shots being fired.

Upon his arrival at the WPD, Det. Oropeza had Sanchez and Estrada isolated from each other and anyone else by placing them into separate interview rooms and closing the doors. Sanchez was searched and had his cell phone removed and impounded as evidence. Sanchez's cell phone was subsequently inventoried at approximately 2125hrs.

Det. Oropeza acknowledged that he and Det. Connolly conducted the first interview with Sanchez unrecorded at approximately 2219hrs and that afterwards he did not tell Sanchez he was free to leave. On 05/02/13 at approximately 0225hrs, Det. Oropeza and Det. Connolly interviewed Sanchez a second time unrecorded and upon concluding this interview, he still did not tell Sanchez he was free to leave. Det. Oropeza stated that at approximately 0342hrs Sanchez was "officially" under arrest just after they had received a positive indication on a presumptive GSR test taken from him. At no point was Sanchez informed that he was under arrest for homicide prior to or during the time he was being questioned about Orozco's homicide on 05/02/13.

During his interrogation, Sanchez provided an account of his activities on 05/01/13, leading up to the time of the shooting before he was handcuffed by Sgt. Conway. Sanchez stated that just before the shots occurred, he was with Bryan Estrada, Heladio Flores, Collin Scheffler, and Leslie Rubio on Bridle Trail Lane. This location is a separate apartment complex located directly south of the Wine Tree apartment complex and Equestrian Drive. Sanchez stated that when they first heard the shots, they all got into Collin's vehicle and left the Bridle Trail Lane location. Sanchez stated that Collin eventually drove them up to the northeast parking lot of the Wine Tree apartment complex. Upon hearing Sanchez describe his activities, Det. Oropeza and Det. Bush would not accept his version of the events, repeatedly accused him of lying, stated they had several eyewitnesses (which did not exist) saying he was involved, and continued to introduce other case facts as they questioned him.

After being accused of lying and being presented with false evidence indicating the people with Sanchez said Sanchez was involved in a shooting, repeatedly suggesting Sanchez shot the gun accidentally or mistakenly (and that otherwise people would believe he did intentionally) and refusing Sanchez the opportunity to call his mother unless he began telling them the "truth," Sanchez confessed and stated he shot a gun that Bryan Estrada originally had and that it

accidentally went off. When asked by Det Bush where he shot the gun from, Sanchez identified that he was north of Equestrian Drive around buildings 434 - 436 Pleasant Run Drive when he allegedly accidentally fired four shots at Orozco. This account would have placed Sanchez shooting from north to southwest which is inconsistent with the known eyewitness accounts and physical evidence at the scene.

Sanchez provided several statements specifically related to how the gun was fired. At one point Sanchez said he held the gun and Estrada shot it. In another account, Sanchez said Estrada handed him the gun and it went off and accidentally fired. In another account, Sanchez stated Estrada pulled out the gun and he (Sanchez) tried to grab it and it went off accidentally four times. Sanchez's description of his actions firing the gun were contradictory and were inconsistent with the other evidence.

On 05/01/13 and 05/02/13, Sgt. Bieschke interviewed both Heladio Flores, age 15, and Bryan Estrada, age 14, without their parents present. Sgt. Bieschke stated that he did not record his initial interviews with Estrada or Flores or provide them with Miranda warnings because he only considered them eyewitnesses at the time.

On 05/02/13, Bryan Estrada was interrogated by Det. Kopecky who repeatedly suggested there was evidence implicating Sanchez in the crime, but Estrada refused to make any incriminating statements and requested to speak with an attorney which ended the interrogation.

Heladio Flores was interrogated over the course of three days from 05/01/13 to 05/03/13. On 05/02/13, after having cooperated with several prior interviews, Flores was transferred to the Glenview Police Department where his interrogation was continued by Det. Bieschke and was video recorded. During this interrogation, Flores was adamant that neither Sanchez, Estrada or himself was in possession of any type of firearm or were involved in the shooting of Orozco. Flores initially stated that at the time of the shooting, they were all together at the Bridle Trail Lane location. Det. Bieschke would not accept Flores' version of their activities as the truth, repeatedly suggesting alternative versions to Flores of what he believed occurred. Eventually, Flores stated that Sanchez had a firearm, but he did not see Sanchez shoot it.

On 05/03/13, Det. Bieschke and Det. Bush interrogated Flores again. Flores repeated that Sanchez had a gun, and didn't shoot it, but after he heard the shots were fired, he handed it to Estrada who threw it into a pond in the Wine Tree apartment complex. Flores said that Sanchez had bought the gun and had it for approximately one week. Flores described the gun as being silver with a brownish/orangish handle. Flores also stated that Sanchez, Estrada and himself walked over to the Wine Tree area from Bridle Trail Lane before the shots were fired.

On 05/02/13, and/or on 05/03/13, Detectives continued to interview the other subjects previously identified as having been with Jesus Sanchez at the Bridle Trail Lane location at the time of the shooting. Detectives interviewed Collin Scheffler, Leslie Rubio and Bradley DeChambre. At some point during these interviews, Collin, Rubio and DeChambre all stated that they were with Sanchez, Estrada and Flores at Bridle Trail Lane at the time the shots were fired which is consistent with what Sanchez, Estrada and Flores had told detectives, but the interviewing detectives did not accept their statements as truthful.

On 05/02/12, and 05/03/13, Det. Girard and Det. Stewart interrogated Collin Scheffler at the Wilmette Police Department. The detectives refused to believe Scheffler when he initially stated he was with Sanchez, Flores, Estrada, Rubio, and DeChambre standing around his car, a white Chevy Malibu with a cracked windshield, when the shots were fired. The detectives repeatedly suggested that Sanchez was not with him at the time the shots were fired and had stepped away from his car. Then, after presenting Collin with false evidence regarding what the other occupants in the car said about the events that night, false evidence regarding video of the area and his tire tracks being found on Equestrian Drive, implying that they were looking at him as a witness when he was actually under arrest, refusing to let him call his parents or go home, and being kept at the station overnight, Scheffler changed his account of their activities. Scheffler stated that that Sanchez, Flores, Estrada, Rubio and DeChambre were in his car and they were travelling westbound on Equestrian Drive with his car lights off prior to the shots being fired. Scheffler stated that he stopped on Equestrian Drive, let Sanchez out of the car, who he saw had a small gun in between his legs. He stated he heard shots and then let Sanchez get back into the car and drove him and the others from the scene. This new account provided by Scheffler was not corroborated by any of the other occupants in the vehicle.

Bradley DeChambre was interviewed by Det. Hanus, Det. Chirio, and then Det. Bush. DeChambre's account of the events was consistent with the accounts offered by the other occupants in Scheffler's vehicle. DeChambre never made an incriminating statement and was not charged.

Leslie Rubio was interviewed on 05/02/13, by Det. Levy and Det. Glad, and on 05/03/13, by Det. Levy and Det. Pinedo. During these interviews, detectives refused to accept her account of the events, presented her with false evidence, stated that she, Scheffler, Sanchez, Estrada, Flores and DeChambre were in Scheffler's car on Equestrian Drive not Bridle Trail Lane prior to the shots being fired, and even told her that Scheffler is not going to be charged because he told the truth. Rubio continued to deny that Sanchez had a gun even after repeated attempts by the detective to get her to say he did.

On 05/04/13, Jesus Sanchez and Collin Scheffler were charged with the murder of Rafael Orozco and the attempted murder of Edson Calleros. Scheffler was found not guilty at trial. Sanchez was found guilty of the murder, and not guilty of the attempted murder. The Appellate Court reversed Sanchez's conviction.

**Opinions**

**1. Did the Officers' conduct deviate from accepted police practices when they stopped, arrested, and transported Jesus Sanchez and Bryan Estrada to the Wheeling Police Department on May 1, 2013, after the shooting of Rafael Orozco?**

According to Sgt. Conway, when he initially encountered Sanchez and Estrada, they were being chased by several Surenos 13 gang members who informed him that they thought Sanchez and Estrada knew who killed Rafael Orozco. Sgt. Conway stated he had put Sanchez and Estrada in handcuffs at this time for their own safety and had them sit down on the

ground next to one of the police vehicles. Sgt. Chirio then directed that Sanchez and Estrada be put in a police vehicle, while cuffed, for their own safety. Sgt. Conway and Det. Oropeza testified that they did not tell Sanchez or Estrada that they were free to leave, or that they were under arrest. In reports from interviews of other subjects at the scene, it was documented that when they saw Sanchez and Estrada handcuffed and sitting on the ground near the police vehicles, they believed both to be under arrest at this time. Sanchez indicated during his recorded interrogation he believed he was under arrest. Det. Oropeza and Sgt. Conway acknowledged that they never told either Sanchez or Estrada that they were free to leave while at the scene.

After being handcuffed, Sanchez and Estrada were frisked before they were put into separate police squad cars and were subsequently transported back to WPD while still handcuffed in the back seat of two separate police vehicles. There was insufficient information regarding their potential involvement at this point to justify detaining them in this manner pursuant to acceptable police practices. At the station, Sanchez was treated as if he was under arrest. Sanchez was put in an interview room, and he was isolated from others. He was not allowed to talk with anyone or make calls. Neither Sanchez nor Estrada were allowed to make phone calls. Sanchez's cell phone was taken from him and impounded. Generally, the process of taking property from an interview subject, impounding it and recording the item in inventory for a criminal investigation usually indicates that the owner of the inventoried item is under arrest and the item(s) is going to be impounded as evidence or for safekeeping.

In looking at the context of the situation at the scene, it was not justifiable to handcuff Sanchez or Estrada for their safety as the Defendant Officers claimed to do so here. Handcuffing them at the scene of the crime did not make them safer, it put them at unnecessary risk as they could no longer defend themselves. If there was truly a concern for their safety, Sanchez and Estrada should have been immediately transported from the scene unhandcuffed to be interviewed at a safer location. Sgt. Conway has indicated that a crowd of people at the scene appeared to be very angry with Sanchez and Estrada. Even so, it was not objectively reasonable for Sgt. Conway, Sgt. Chirio, Det. Oropeza and Det. Bieschke to believe that Sanchez and Estrada voluntarily came to the WPD given accepted police practices when they were handcuffed, searched, transported, placed into interview rooms isolated from others, and prevented from making phone calls to their parents, despite requests to do so. The information Sgt. Conway had received at the scene from the mob chasing Sanchez and Estrada had not yet been vetted as to whether or not it was even credible. If it was truly the intention of the Defendant Officers to further ascertain their level of involvement, they could have transported them down the street to a safer location uncuffed, offered to call their parents, and requested an interview. These procedures would have been consistent with acceptable police practices related to potential eyewitnesses and/or safety concerns.

Based on the circumstances as described by the officers and bystanders from the scene, Sgt. Conway, Sgt. Chirio, Det. Oropeza arrested Sanchez and Estrada when they put them in handcuffs and transported them to the WPD. Based on the totality of the circumstances of what information they were in possession of at the time, they did not have probable cause to do so as Sgt. Conway, Sgt. Chirio and Det. Oropeza acknowledged. Specifically, these

officers stated they did not observe or have information that Sanchez and Estrada had committed any crime prior to handcuffing them and having them transported to the WPD.

**2. Did the Officers' conduct deviate from accepted police practices when they interrogated Jesus Sanchez?**

In reviewing the conduct of Det. Bush, Det. Oropeza, and Det. Connolly in the interrogation of Jesus Sanchez on 05/01/13 through 05/03/13, I will be providing an opinion on the lack of consistent video recording, the intentional delay in providing Miranda warnings, the denial of the Right to Counsel, the lack of corroborating details to justify the on-going arrest/detention of Sanchez and the lack of corroborating details to support his confession as being reliable, and the refusal of allowing Sanchez to contact his mother.

A. *Lack of consistent video recording of contact with Sanchez once he was brought to the interview room from the scene*: Once Sanchez was placed in the interview room on 05/01/13 at approximately 2219hrs, he was twice briefly interviewed by Det. Oropeza and Det. Connolly. It was later confirmed that the video recording equipment was fully operational at this time. It was not until 05/02/13 at approximately 06:44:18hrs, that Det. Oropeza turned on the video recording to Sanchez's interview room. Therefore, there is no record as to the specific types of questions Det. Oropeza or Det. Connolly asked Sanchez during these initial two interviews. This tactic of conducting several short off-camera interviews prior to turning on the recording equipment and then reading Miranda warnings is a tactic used by some investigators intending to prep the suspect to confess once the camera is turned on and to make it appear more voluntary. This is not an acceptable police practice.

B. *Delay in providing Miranda to Sanchez until after two initial interviews:* This tactic of conducting an initial interview first and then later returning to provide Miranda warnings is often referred to as the "Two-Step Interrogation" technique. The U.S. Supreme Court has ruled that this intentional "question first, Miranda second" technique generally renders any subsequent confession inadmissible (Missouri v. Seibert, 542 U.S. 600 (2004)). Given acceptable police practices, a detective should have provided Miranda warnings to Sanchez prior to conducting the first interview when Sanchez was brought to the station in handcuffs, was placed in a suspect interrogation room, isolated, had his cell phone removed and inventoried, and was not allowed to leave or make phone calls. A reasonable investigator would have concluded that Sanchez was under arrest and was not there voluntarily at that time and would have determined that Miranda warnings were needed to conduct any further questioning.

C. *The Denial of Right to Counsel:* Sanchez's Motion to Suppress indicates that he had requested an attorney prior to the video recorded portion of his interrogation. Later, in the recorded portion of his interrogation Sanchez can be heard inquiring about this prior request for counsel when he states to Det. Oropeza, "What about

my lawyer?" Upon hearing Sanchez's first request for counsel during the initial unrecorded interviews, the detectives should have terminated all questioning and assisted him in contacting an attorney. Denying a person their right to counsel once the request is clearly articulated is not consistent with acceptable police practices.

D. *The lack of corroborating details to justify the on-going arrest and detention of Sanchez and the lack of corroborating details in Sanchez's confession making it unreliable:* Given the information within the possession of Sgt. Conway, Sgt Chiro, Det. Oropeza, there was not enough corroborating information to justify the detention or arrest of Jesus Sanchez. From the very first moment of contact with Sanchez and Estrada as they were running from the Surenos 13 gang members, Sgt. Conway and Sgt. Chirio appeared to believe they were involved with the shooting in some manner but lacked probable cause to arrest them.

Prior to Sanchez's recorded interview, the detectives were aware that a witness described a dark colored sedan leaving the scene of the shooting shortly after shots were fired and the car was travelling at a high rate of speed with the lights off. These are suspicious circumstances. This was an investigative lead which could have been a suspect other than Sanchez, as there were no reports that Sanchez was ever seen driving or riding in a dark colored sedan on 05/01/13. This information appears to have been disseminated to the team investigating the Rafael Orozco murder as it appears in handwritten notes of Det. Glad, one of the NORTAF detectives assigned to the case. There are no reports indicating that this information was ever investigated as it appeared that Det. Oropeza and Det. Bush, among others, were not willing to consider the possibility of a different suspect other than Sanchez and this information did not corroborate their version of what occurred.

Prior to Sanchez's interrogation, Det. Bush and Det. Pinedo, among other investigating detectives, learned of a suspicious vehicle, a white Jeep Cherokee/SUV, and suspect, who was a 6'2" tall, Hispanic male, wearing a light blue short sleeve t-shirt and white shorts. The vehicle and suspect were seen moments before the shots were fired just east of the courtyard on Equestrian Drive. This is another investigative lead which did not corroborate Sanchez's detention, arrest or charging. It is a car Sanchez and his friends were not driving in or otherwise affiliated with and the person seen exiting the vehicle did not match the clothing or physical description of Sanchez or any of the other people he was identified as being with. This information also appears to have been disseminated to the investigative team according to the handwritten notes of Det. Glad, where Det. Glad referred to this vehicle as the "suspect veh."

In both of these two eyewitness reports, I was not able to see any further follow-up investigative work into these leads. I did not locate supplemental reports inquiring with other investigative units or agencies about incidents with similar vehicle descriptions and similar suspect descriptions. There was no written

documentation indicating that the video captured by red light cameras were checked to identify this car, although such investigative follow-up was conducted to find Collin Scheffler's white Chevy Malibu.

Also, there were four independent eyewitness who were contacted and interviewed between 05/01/13 at 2340hrs to 05/02/13 at 0005hrs which all stated they believed the fired shots emanated from the area on or north of Equestrian Drive with a trajectory of south to north. See the "Known Facts" pages 3-4 for additional details.

In assessing all of this initial information of both eyewitness reports of possible other investigative leads and the eyewitness interviews all suggesting a trajectory of the shots coming from south to north from an area either on or north of Equestrian Drive, there does not appear to be any information corroborating the account pursued by Det. Bush and Det. Oropeza of Sanchez being involved. In addition, none of the statements obtained in subsequent interviews with Bryan Estrada, Heladio Flores, Scarleth Rodriguez, Danielle Pettibone, Leslie Rubio, and Collin Scheffler corroborate any reliable information that Sanchez was involved which was not already suggested by the detective's use of asking a tremendous number of leading questions or providing opinion statements. A reasonable police officer/investigator would have clearly identified this lack of corroborating details as inconsistent with the account elicited from Sanchez and released him.

In evaluating the confession provided by Sanchez, it was unreasonable given accepted police practices for Det. Oropeza and Det. Bush to believe there was sufficient corroborative facts to believe Sanchez gave a reliable confession. When Sanchez initially confessed, there were several statement-evidence inconsistencies. Statement-evidence inconsistencies are statements provided by a subject which are inconsistent with the known evidence in an investigation. At any point in an investigation when a statement-evidence inconsistency is identified, it should be a warning sign to the investigator that there is a potential discrepancy which needs to be resolved to improve the integrity of the investigation.

In looking at the point in the interrogation where Sanchez offers his first confession, it is important to understand what preceded his confession. Prior to Sanchez's confession, Det. Bush and Det. Oropeza had repeatedly suggested to Sanchez that he shot Orozco by accident, that it was in self-defense, that the judge would be harsher on him if it was done intentionally, that Bryan Estrada was possibly to blame, and that he could only speak to his mom or go home after he confessed. It was only after all of this that Sanchez offers the following admissions that the gun went off accidentally, that Estrada had taken it and ran away, and that the firearm was a revolver. As soon as Sanchez provided this information, he requested to be allowed to go home, further indicating that he was attempting to provide the detectives precisely what they wanted to hear so that he

12

could remove himself from this confrontational, coercive interrogation. Sanchez made two immediate requests, "I want to go home" and "I want to go home to my mom" both of which were ignored by the detectives.

After this interaction, we can see a variety of inconsistent statements further showing the lack of reliability of the information Sanchez was providing. Sanchez provided several statements specifically related to how the gun was fired which were contradictory. Conflicting statements like this are referred to as within-statement inconsistencies as they are statements about the same incident which are inconsistent. Sanchez's description of his actions firing the gun completely contradicted each other, should have been clarified further by the detectives, and not perceived as reliable.

At one point Det. Oropeza asked Sanchez to demonstrate how the gun was fired. Sanchez proceeds to explain that as he was handed the gun by Estrada, it went off four times by accident. Anyone who works in law enforcement and understands anything about firearms, especially revolvers would understand the unlikely probability of an accidental discharge of a revolver four consecutive times. This information of the revolver accidentally discharging four times was never corroborated by anyone else.

The likelihood of four accidental discharges from a revolver occurring is very rare. In my twenty-one years of law enforcement experience, I have never heard of a revolver accidentally being discharged more than once, much less four times consecutively. A reasonable police officer would have determined these inconsistent accounts from Sanchez as highly unreliable especially when combined with the improbable location of where he describes the shots coming from, northeast of the victim.

Then, Sanchez described the gun as a black revolver with a black handle. This color description is not consistent with the description provided by Heladio Flores who initially described the revolver as silver with a brown handle. When asked by Det. Oropeza what Estrada said to him when he showed him the gun in the car, Sanchez stated Estrada said, "he was going to get those guys back." This statement was never corroborated by the other occupants of the vehicle.

When asked by Det. Bush where he shot the gun, Sanchez identifies that he was around 434-436 Pleasant Run Drive when he allegedly fired the four shots accidentally at Orozco. This account would have placed him shooting from north to southwest which is inconsistent with the known eyewitness accounts and the forensic evidence of the trajectory of the shots from the satellite dish in the courtyard where Orozco was shot in the back as he was facing north.

Det. Bush also asked Sanchez what he was wearing that day and Sanchez indicates he was wearing a black tank top and plaid shorts. After taking a break, Det. Bush again asked Sanchez what he was wearing knowing that it does not

13

match the description provided by Edgar Uriel Martinez of the suspect seen getting out of the White Jeep Cherokee/SUV on Equestrian Drive, walking alongside of the vehicle in the direction of where the shooting occurred moments before the shooting occurred. Det. Bush and Det. Oropeza should have known that Sanchez at 5'9" was considerably smaller than that suspect at 6'2", who was wearing a light blue short-sleeve shirt with white shorts.

On 05/02/13 at approximately 0952hrs, Det. Bush and Det. Oropeza continued to interrogate Sanchez and Det. Bush provided him a map. It is clear that Det. Bush knows that the location originally provided by Sanchez as having allegedly shot at Orozco is inconsistent with the information/evidence they have from the scene and other eyewitnesses. Det. Bush is clearly attempting to lead Sanchez into putting his shooting position as being south of Orozco on Equestrian Drive when he stated to Sanchez, "Now, here is Equestrian Road. You weren't standing here?" and Sanchez responds, "No."

As Det. Bush and Det. Oropeza continue to question Sanchez as to where he and Estrada were standing, Sanchez changed his account again of how the gun went off. This time, Sanchez stated that as Estrada attempted to shoot at the group in the courtyard, he (Sanchez) tried to take the gun away from him (Estrada) and it accidentally went off in his (Sanchez) hand. Sanchez also clarified that they were standing in the area of buildings 434 and 436 when the shots were fired. This location is northeast of where Orozco was shot and is not consistent with the other eyewitness reports.

Based on all of this information provided by Sanchez in his interrogation, a reasonable police officer would have to perceive the reliability of his statements as very problematic for a variety of reasons. First, Sanchez did not place his possible shooting location in an area that was consistent with the known evidence from four eyewitness statements and the scene evidence as being shot in a direction from south to the north from an area on or near Equestrian Drive. Second, the manner in which he describes the gun accidentally firing four times in a row was extremely unlikely. Third, his description of the color of the gun was inconsistent with Heladio Flores' alleged description. Fourth, the clothes Sanchez was wearing did not match the clothing description of the likely shooter in the case escaping in the white Jeep Cherokee/SUV. Fifth, Sanchez was not driving or riding in the two cars that were most likely involved in the shooting right before the shots were fired on Equestrian Drive, the white Jeep Cherokee/SUV or the dark sedan. Finally, Sanchez's changing account of who fired the gun and how it was fired.

E. *Would a reasonable police officer understand when Sanchez repeatedly stated, "I want to talk to my mother", he wanted to speak to her?:* In Sanchez's interrogation he requested to speak to his mother over twenty times between repeated contacts with Det. Bush and Det. Oropeza from 05/02/13 to 05/03/13.

14

Sanchez can be seen begging and pleading with them each time they refuse his requests. A reasonable police officer would have allowed this call for Sanchez.

3. **Did the Officers follow accepted police practices in investigating, evaluating, and considering evidence that corroborated or contradicted Jesus Sanchez's confession?**

In assessing whether the Officers followed accepted police practices in investigating, evaluating and considering evidence that either corroborated or contradicted Jesus Sanchez's confession, I was able to determine that there was a consistent lack of the re-evaluation of evidence which contradicted Sanchez's confession obtained by Det. Oropeza and Det. Bush. I also found areas where detectives ignored leads which would have corroborated Sanchez's original account of his activities. The failure to re-evaluate the evidence deviated from accepted police practices.

The main areas which support the finding of failures to re-evaluate evidence that contradicted Jesus Sanchez's confessions are as follows:

A. *The lack of any follow-up directed towards any information suggesting a suspect other than Jesus Sanchez.* It appears there were four separate eyewitness interviews conducted between 05/01/13 and 05/02/13 in which alternative investigative suspect leads were obtained.

Dark colored vehicle leads:
On 05/01/13, Volodymyr Motkalyuk of 1265 Paddock Drive reported seeing a black or dark colored older sedan, possibly a Mazda 323 or Nissan Sentra, traveling at high rate of speed with its exterior lights off westbound on Equestrian Drive from the Wine Tree apartment complex. Motkalyuk stated that as the car continued traveling westbound past the Equestrian Park, its exterior lights were turned back on. No further supplemental report documenting any further action was identified as to this lead.

On 05/02/13 after Leslie Rubio is arrested, she mentions to Det. Glad and Det. Levy that she believed the "bullets" came from a dark car, possibly an older black model Malibu. No further supplemental report documenting any further action was identified as to this lead.

Det. Bieschke indicated that during his interviews with Bryan Estrada and Heladio Flores, they each mentioned an altercation Estrada had on 04/30/13 in which SGD's attacked Estrada after exiting from a black Chevy or dark colored 4-door sedan. I was not able to locate any other supplemental reports vetting this lead any further by Det. Bieschke or others.

Det. Bieschke indicated that while he was initially at the scene, he had been informed that the Lollipop SGDs may have been responsible for shooting Rafael Orozco, but he stated he never conducted any further inquiry into this

potential suspect lead or was asked to conduct any further investigation into that information by other scene supervisors.

White colored vehicle leads:
On 05/01/13 approximately 2345hrs, Det. Pinedo and Det. Bush conducted an interview with resident, Edgar Uriel Martinez, of 482 Pleasant Run Drive at the WPD. Edgar stated that he was standing outside the southwest corner of his apartment around 2100hrs facing to the south when he observed a white Jeep Cherokee/SUV drive very slowly westbound on Equestrian Drive with its headlights off and that a Hispanic male, approximately 6'2", wearing a light blue short-sleeve shirt and white shorts exit the vehicle from the right rear passenger side door. Edgar stated the subject continued to walk westbound on the grass while the vehicle drove next to him. Edgar stated he lost sight of the subject and vehicle due to the building south of him blocking his view. Seconds later, Edgar heard six gunshots. Edgar did not report seeing the subject walking or the vehicle again after hearing the shots. No further supplemental report documentation was identified as to exploring this potential suspect lead

On 05/04/13, Det. Connolly contacted resident, Laura Durgin, of 492 Pleasant Run Drive, #D4. On the night of the shooting, Durgin reportedly heard approximately five gunshots but did not see any suspects. Durgin also mentioned that she had previously seen a white Blazer being driven by a male Hispanic driver cruising around the neighborhood on Equestrian Drive in the days just prior to the shooting.

Other suspect leads:
Ofc. McGuire's handwritten notes he wrote the following information obtained from Bryan Estrada, "*Lollipop S.G.D.s or Piper pretended to be Colonial M/H short fade, heavy build, early 20's, blk shirt, M/H 6'00" blk hat "C" on it, SGD standing by the entrance.*" It is not clear from his notes as to who he is describing. I was unable to locate supplemental reports from Ofc. McGuire documenting this information or any investigative follow-up. This information was also initially documented in Det. Bieschke's supplemental report, but I was unable to locate any follow-up being conducted thereafter into this potential suspect lead identifying someone other than Sanchez.

In identifying the lack of investigative follow-up related to each of these leads, the Officers involved in the Rafael Orozco murder investigation did not follow accepted police practices when investigating, evaluating, and considering evidence of other potential suspects and failed to investigate potential viable suspect leads. I was not able to locate any follow-up investigation into these potential alternative suspects.

B. *Inconsistencies in potential suspect physical and clothing descriptions.* There were inconsistencies between Jesus Sanchez physical and clothing description

when compared with other possible shooters. Sanchez was identified as wearing plaid shorts and a black tank top and is 5'9" tall. The potential suspect described by Edgar Uriel Martinez walking along the white Jeep Cherokee/SUV just prior to the shooting was described as a Hispanic male, 6'2", wearing light blue shirt and white shorts. These descriptions are not close as to physical or clothing descriptions of Sanchez.

*Inconsistencies between the verbal accounts of Jesus Sanchez, Heladio Flores and Collin Scheffler.* There were inconsistencies between where Sanchez and Flores described how they got to the Wine Tree apartment complex just prior to the shooting. Sanchez stated they were dropped off at the far east entrance by Collin Scheffler prior to the shooting while Flores stated they walked to the Winetree apartment complex from Bridle Trail Lane in the Polo Run apartment complex. There were inconsistencies in descriptions of the revolver allegedly used to shoot Rafael Orozco. Sanchez described it as a black revolver with a black handle and Heladio Flores described it as a silver revolver with a brownish (orangish, reddish/brownish) handle. There were also significant inconsistencies as to where Jesus Sanchez and Heladio Flores described how they came into possession of the gun. Sanchez said he was handed the gun, while Flores claimed he bought the gun approximately a week earlier for around $400.

Scheffler's statement was also found to be inconsistent with both Sanchez and Flores because he stated that he dropped Sanchez off on Equestrian Drive prior to the shots being fired and then picked him up after the shots were fired. This contradicted Sanchez's statement as to where he claimed Scheffler dropped him off prior to the shooting.

C. *Inconsistencies as to the location of the shooter.* There were inconsistencies from where all four eyewitnesses described the shots emanating from being in the area on or north of Equestrian Drive (south of the victim who was facing to the north), as well as the forensic evidence, and the location of where Sanchez had told detectives he was standing northeast of the victim.

D. *Inconsistencies as to where the gun was allegedly hidden at.* There was also a lack of any corroborating evidence in the statements from Heladio Flores that Bryan Estrada had thrown the gun into the pond. Dive teams searched this pond over three days and no firearm was ever located. The location of the gun potentially being in the pond was never introduced independently by any of the subjects interviewed in this investigation. Each time the pond came up in the interviews it was only because the detectives had introduced this information through the use of leading questions.

The main areas which support the finding of failures to re-evaluate evidence that corroborated Jesus Sanchez's original account are as follows:

E.   *Lack of follow-up on leads corroborating Jesus Sanchez's account*. The Detectives also did not follow up on leads that would corroborate Sanchez's account of the day. On 05/10/13 at approximately 1730hrs, Det. Chirio and Det. Musolf were canvassing the neighborhood on Bridle Trail and contacted resident, Kelly Guth, of 479 Bridle Trail. Guth stated that on 05/01/13 at approximately 2115hrs, she walked outside her front door and observed four to five teenagers (one female and the rest were male) hanging out around the park bench next to the pond. Guth also observed two unknown male subjects sitting inside of an older model (early 2000's) white four door vehicle. I was not able to locate any supplemental reports documenting any further follow-up as to identifying who these subjects were or the type of vehicle they may have been associated with. Guth should have been shown photo line-ups of Sanchez, the other occupants of Scheffler's vehicle, and potentially the white Chevy Malibu driven by Scheffler. This is another example of "investigative tunnel vision" by detectives ignoring potential evidence which corroborated Sanchez's original account of their activities.

As an investigation for a homicide proceeds past the initial response to the scene, the collection of new information and the constant re-evaluation of that information is critical to the successful resolution of the case and for enhancing the integrity of the investigation to be presented for potential prosecution. Confirmation bias, also known as "tunnel vision," is a challenge in each investigation and occurs when investigators come to believe that their hypothesis of what occurred and who is responsible is so accurate that they often fail to listen to other information which can indicate other more likely suspects and they may even ignore reliable evidence not in support of their initial theory. The investigators should have realized Sanchez's confession was completely unreliable. This failure to re-evaluate the lack of evidence consistent with the details in Sanchez's confession in order to substantiate if it was reliable deviated from acceptable police practices.

**4.  Did the Officers follow accepted police practices when writing their police reports regarding the investigation?**

The accepted police practice of documenting involvement in an investigation entails conscientious note taking, completion of all supplemental reports in a timely manner, memorialization of any victim, eyewitness and suspect contacts through audio and video recordings if possible, and the impounding of all related handwritten notes which are not otherwise transferred into the supplemental report(s). These requirements may vary slightly from each jurisdiction, but the foundational guidelines should remain.  Mainly, memorialize everything possible, stay organized, and complete all follow-up tasks thoroughly. In reviewing whether Officers followed accepted police practices when writing their police reports regarding this investigation, I identified several instances which warranted additional documentation.

Failure to Document Crucial Information

18

A.  *Other Suspect/Vehicle Lead:* On 05/01/13 at 2345hrs, Det. Pinedo and Det. Bush interviewed Edgar Uriel Martinez who was an eyewitness that lived at 482 Pleasant Run Drive. In Det. Bush's handwritten notes of this interview (Wheeling 01416), he documents that Martinez informed him of a vehicle he observed slowly traveling westbound on Equestrian Drive just prior to the shooting as a white Jeep Cherokee and that the passenger who exited and was slowly walking west along side of it was a Hispanic male approximately 6'2" tall. However, in reading Det. Pinedo's supplemental report documenting this interview, the vehicle is only described as a white SUV and the subject who exited was only described as a male subject. No further description was provided. I was not able to locate any subsequent supplemental reports documenting the type of this vehicle as a Jeep Cherokee, the subject's race, or his height. This could be important suspect information that was not documented in the supplemental report.

B.  *Other Suspect/Vehicle Lead:* Also, on this same page of Det. Bush's handwritten notes at the bottom, Det. Bush wrote that "Miguel and Brian got into it with occupants of white Jeep on Friday or Saturday." I did not see this information documented within any supplemental report by Det. Pinedo or follow-up conducted as to this potential suspect lead.

C.  *Other Suspect/Vehicle Lead:* On 05/02/13 at approximately 1207hrs, Leslie Rubio is interviewed by Det. Glad and Det. Levy at the Skokie PD after she was arrested. At approximately 1308hrs, Leslie mentions that she believed the "bullets" came from a dark car, possibly an older black model Malibu. This description was not mentioned in Det. Glad's supplemental report. There also did not appear to be any follow-up questions asked about this vehicle, direction of travel or anything else.

D.  *Lack of documenting Investigative Briefings:* There was a noticeable lack of the mention of investigative notes from the main scene briefings and subsequent briefings with the NORTAF or Wheeling PD investigative units within any of the supplemental reports. In attempting to determine the timeline of when certain information was obtained and who was informed of this information, it is often helpful to review the case notes taken from investigators who had attended the many case briefings which may have taken place at the scene command post and at the command center after the scene has been cleared. In this investigation, I was hardly able to find any case notes related to these briefings or what may have been in them within the related supplemental reports. It should be mentioned that NORTAF did appear to have a system of providing case books for their investigators to use for note keeping and later impound as evidence in their entirety. However, few notes were found within these case books related to the briefings.

These undocumented potential suspect leads should have been vetted further to determine whether the subjects may have been connected to the murder of Rafael

Orozco. Officers did not follow accepted police practices by failing to include these investigative leads in their supplemental reports and failed to investigate any further to remove them as being involved.

**Summary of Findings**

From the very beginning of this investigation, we can see tunnel vision setting in with the primary two investigators, Det. Oropeza and Det. Bush. Having received the initial information on 05/01/13 from Edson Calleros about the two confrontations earlier that day with Jesus Sanchez, Bryan Estrada, and Heladio Flores combined with the manner in which Det. Conway and Sgt. Chirio had initially encountered Sanchez and Estrada fleeing from the Surenos 13 gang members who claimed that they knew something about the murder of Rafael Orozco, Det. Oropeza, Det. Bush, Det. Bieschke, Det. Kopecky, and Det. Pinedo, as well as Det. Levy, Det. Glad, Det. Girard, and Det. Stewart quickly focused all their attention on eliciting confessions from Jesus Sanchez, Bryan Estrada, Heladio Flores, Collin Scheffler, Leslie Rubio and Bradley DeChanbre.

The confessions they initially obtained from Sanchez, and later from Heladio Flores and Collin Scheffler were in no way corroborated by the scene evidence or the four eyewitness accounts. The overall lack of corroborating details combined with the lack of independent corroboration of any information provided by Sanchez which was not already fed to him during the interview through the use of leading questions, opinion statements, theming tactics (minimization tactics) and false evidence ploys (maximization tactics) by the detectives suggests that any reasonable officer would have viewed his subsequent confession as highly unreliable.

This tunnel vision created an atmosphere in each of these interrogations where the detectives were not following best or accepted police practices of asking open-ended neutral questions seeking to discover the truth but were instead asking a lot of confirmatory, guilt presumptive closed-ended leading questions and forced choice question designed to elicit responses consistent with what they believed was the correct version of what occurred and who was responsible. The evidence pertaining to the multiple eyewitness statements and the physical evidence at the scene did not corroborate Jesus Sanchez's forced confession in any way as to the location of where he allegedly shot the gun from, how the gun accidentally fired, the color of the gun, where the gun was allegedly disposed afterwards, and how they came to arrive at the area just before the shots were fired.

Another area of concern in this investigation was the lack of memorializing all of the interviews, the use of a two-step interrogation technique of question first and then provide Miranda warnings later to Sanchez, and the denial of Sanchez's right to counsel. Not video recording the first two interviews with Sanchez by Det. Oropeza and Det. Connolly in addition to the two interactions in which he allegedly voluntarily provided his hands for GSR swabs, detracts from the integrity of the investigation. There was no reason not to have recorded these earlier interviews or provided Miranda warnings at the time he was placed into the interview room, physically searched, had his cell phone removed and inventoried, and asked incriminating questions about his involvement in the incident under investigation while not being allowed to leave or even call his mother. A reasonable officer would have recorded all the interviews, provided his Miranda rights advisement immediately, and fulfilled his request for counsel.

Another area of concern in this investigation because of this initial tunnel vision, is the intentional lack of vetting potential investigative suspect leads in the first few days which were not followed up on or at times even documented in supplemental reports. This is another area where we can see the detrimental effects of tunnel vision as there appeared to be a complete lack of interest in assessing the likelihood of any other potential suspect(s) once the detectives began to focus on Sanchez.

In closing, it is my opinion that there was insufficient probable cause to arrest Sanchez and all those connected to him on 05/01/13. Sanchez's subsequent confession should be considered unreliable because it lacked sufficient corroboration, contained many statement-evidence inconsistencies and was obtained by the use of coercive interview tactics combined with isolation, lengthy interviews conducted over the course of several days, implicit promises of leniency, and the promise he could speak with his mom once he told them the "correct version of the truth" which aligned with their tunnel vision of what had occurred.

_Matt Jones_

_____

Matt Jones

21