**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JESÚS SÁNCHEZ, | |
| Plaintiff, | No. 19-cv-02437 |
| v. | Judge John F. Kness |
| THE VILLAGE OF WHEELING *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jesús Sánchez spent nearly five years incarcerated for murder before the Illinois Appellate Court reversed his conviction and concluded both that police officers coerced his confession and that Plaintiff did not commit the murder. Plaintiff now brings this suit against Defendants the Village of Wheeling (officers Chiro, Conway, Connolly, Kopecky, Oropeza, and Pinedo) ("Wheeling Defendants") and the City of Evanston (officer Bush) ("Evanston Defendants") under various state and federal provisions. Broadly summarized, Plaintiff alleges that the Defendant officers violated his federal constitutional rights and Illinois law by fabricating a false case against him. Plaintiff claims the officers detained him without probable cause, coerced his involuntary confession, fabricated or manipulated witness statements and evidence, and maliciously prosecuted him for a crime they knew (or should have known) he did not commit, resulting in his wrongful conviction and emotional trauma. The matter is now before the Court on two motions for summary judgment: one filed by the Wheeling Defendants (Dkt. 220) and one by the Evanston Defendants

(Dkt. 223).

For the reasons stated in this opinion, Defendants' motions are largely denied. Plaintiff's federal claims and most of the state law claims must be resolved at trial.

## I.    BACKGROUND

On the evening of May 1, 2013, a shooting occurred in the Winetree apartments area of Wheeling, Illinois. (Dkt. 247 ¶ 1.) Members of rival gangs had been present at the Winetree apartments, and several individuals, including Rafael Orozco and Edson Calleros, gathered near a streetlamp between buildings 486 and 492, south of Pleasant Run Drive and north of Equestrian Drive. (*Id.* ¶ 1.) Four shots were fired. (Dkt. 236-16 at 9 ¶¶ 21–23.) Orozco announced he had been hit, and he later died from a single gunshot wound to the back. (Dkt. 236-85 at 6 ¶¶ 12–17.) Plaintiff Jesús Sánchez, then 18 years old, was nearby at the time of the shooting with Miguel Cortes, Bryan Estrada, Heladio Flores, and Scarleth Rodriguez. (*Id.* ¶ 4.)

At 9:02 p.m., Sergeant Michael Conway, of the Village of Wheeling Police Department, arrived at a chaotic scene. (Dkt. 236-10 at 2.) The initial police broadcast reported a possible drive by shooting from Equestrian Drive. (*Id.*) About thirty minutes after his arrival, Conway saw Sánchez and Estrada running toward him, chased by several members of the Sureños gang. (*Id.* ¶ 10.) Conway handcuffed both, directed them to sit on the curb, and left them restrained. (*Id.*) Officer Oropeza and Bieschke then placed Sánchez and Estrada in separate squad cars for transport to the station, still handcuffed. (*Id.* at ¶ 12.) Detective Michael Bieschke located Flores, then 15 years old, and took him to an interview room for questioning. (*Id.* at ¶ 15.)

2

At the police station, an officer took Sánchez's phone. (*Id.* at ¶ 19.) Oropeza placed Sánchez in an interview room at about 10:30 p.m. (*Id.* at ¶ 18), and an officer swabbed Sánchez's hands around 11 p.m. for gunshot residue testing, later collecting his clothing for the same purpose. (*Id.* at ¶ 109.) Shortly after 3 a.m. the next day, Oropeza resumed questioning about an earlier fight involving Calleros; officer Conboy then swabbed Sánchez again at 3:42 a.m., and performed what he called a "presumptive GSR test," which Defendants claim yielded a positive indication (Plaintiff disputes the result was positive). (Dkt. 221 ¶¶ 58–61.)

Before 7 a.m., Oropeza turned on a video camera. (*Id.* ¶ 68.) At about 7:30 a.m., he read Miranda warnings and brought in Detective Bush. (*Id.* ¶¶ 69–73.) Confronted with the purported positive test, Sánchez repeatedly denied seeing or firing a gun. (Dkt. 236 ¶¶ 40.) The detectives told Sánchez his story was "bullshit," asserted that Sánchez "can't lie" about the presumptive GSR test, and claimed that "[e]verybody else" was saying that Sánchez was the shooter (no such witnesses existed). (Dkt. 248 ¶ 40, 65.) They also suggested he blame Estrada. (Dkt. 236 ¶ 43.) Sánchez cried and said, "I didn't do anything." (*Id.* ¶ 50–51, 55.) Bush moved the table aside, stood close to Sánchez, and pressed, "This was an accident, you didn't mean for this to happen, did you." Sánchez continued to deny involvement and asked to see his mother. (*Id.* ¶ 46–47.)

Roughly ten hours after Sánchez had been brought to the station, he altered his account under continued pressure. (*Id.* ¶ 52.) In response to Bush's prompting about "what did Bryan do," Sánchez said Bryan Estrada fired the gun. (Dkt. 236-11

3

at 38.) When Bush insisted that "[e]verybody's telling me that you had the gun," Sánchez swore, "I didn't have any gun, sir." (Dkt. 236 ¶ 42; Dkt. 236-92 at 24.) Bush circled back to an accident theme and limited Sánchez's choices to accident or intent, telling him, "I need to hear it from you," while Sánchez responded, "Sir, I want to see my mom." (Dkt. 236 ¶ 47, 51.) Eventually Sánchez said, "I held it but Brian shot it," then later offered that it "went off by itself," and identified the gun as a black revolver. (*Id.* ¶ 53, 57, 62.) Sánchez placed the accidental discharge on the map between buildings north of where Orozco stood when he was shot. (Dkt. 236-8 at 40–41.) Sánchez explained that he ran to the police because the Sureños had chased him. (Dkt. 236 ¶ 9–10.)

Throughout the interview, Sánchez pleaded to contact his mother, saying she had just had surgery and was worried. (Dkt. 236-92 at 68.) The detectives repeatedly deferred or denied contact, telling him he could speak with her after they "talk about this" and after they got "the truth." (Dkt. 236 ¶ 51.) Over the next several hours, Sánchez knocked on the interview room door multiple times, asking "Can I talk to my mom yet," and "just a quick call," and was told "not right now," and "No, that cannot be done." (Dkt. 236 ¶ 64; Dkt. 236-92 at 60, 63.)

On May 3, Bush and Oropeza questioned Sánchez again. Sánchez recanted, stating that his May 2 account was false, that no one in the car had fired a gun, and that a person known as "Bone Crusher" had threatened him and Leslie. (Dkt. 236-19 at 100–108.) When Sánchez asked if others had confirmed his initial account from Bridle Trail, Bush responded, "This was the made-up story that you guys had," and

4

accused Sánchez and Leslie of fabrication. (*Id.* at 105–108.)

Flores, then 15 years old, gave an interview which followed a similar path. (Dkt. 236 ¶ 66.) Flores's initial, unrecorded account matched Sánchez's first version, placing the group on Bridle Trail when the shots were heard, with no implication that Sánchez fired a gun. (*Id.*) After Bush and Oropeza obtained incriminating statements from Sánchez, Bieschke began a recorded session with Flores around 10 a.m. on May 2. (*Id.* ¶ 67.) The detectives told Flores they knew what had happened, accused him of lying, and falsely asserted that "a bunch of people interviewed" were saying Flores was "involved" with the shooting. (Dkt. 236 ¶ 69; Dkt. 236-28 at 20–25.) Under these accusations and questions, Flores shifted, stating that Sánchez held a silver gun with a brown handle, agreeing that Sánchez threw the gun in a pond when the officers suggested that detail, and marking on the map the same north-side location the Officers got Sánchez to mark. (Dkt. 236 ¶¶ 77, 79, 89.) Police searched the pond for three days but found no gun. (*Id.* ¶¶ 91–92.) Moreover, one spent bullet and a nicked satellite dish were found near where Orozco was hit, and officers concluded the fatal bullet traveled from south of Orozco, consistent with witnesses who reported flashes from Equestrian Drive to the south but inconsistent with the north-side location the officers elicited from Sánchez and Flores. (*Id.* ¶ 37.)

At trial, a state trace analyst testified that he found no lead, barium, or antimony on Sánchez's hands or clothes, and none on Estrada's or Flores's either. (Dkt. 236 ¶ 118; Dkt. 236-70.) Oropeza admitted that he lied to Sánchez to induce a confession. (Dkt. 248 ¶ 42.) Flores, then sixteen, testified that he had lied on video

5

because police threatened to charge him with murder, that he agreed to what Bieschke suggested, and that he had never seen Sánchez with a revolver. (Dkt. 236-17 at 4–5, 12, 20–21.)

After a day of deliberations that included a note stating "[w]e are split," the jury returned a verdict finding Sánchez guilty of Orozco's murder and not guilty of attempting to murder Calleros. (Dkt. 236 ¶ 117); *People v. Sanchez*, 2018 IL App (1st) 143899, ¶ 58, 103 N.E.3d 529, 538. The state trial court later imposed a 45-year sentence. (Dkt. 248 ¶ 117).

After Plaintiff had been incarcerated for nearly five years, the Illinois Appellate Court reversed the conviction on direct appeal in 2018, concluding that the confession was involuntary under *Haynes v. Washington*, 373 U.S. 503 (1963), that officers violated Illinois's right to timely family contact by refusing Sánchez's repeated requests to speak with his mother, and that these errors required a new trial, specifically holding that "[b]y refusing Sánchez's request to call his mother, the detectives also violated section 103-3(a) of the Code." (Dkt. 236 ¶ 118); *People v. Sánchez*, 2018 IL App (1st) 143899, ¶¶ 1, 19, 70, 73, 75, 81, 92. As the appellate court also concluded, the evidence was insufficient to establish that Sánchez committed the murder and directed that sanctions be considered against the officers in the light of the misconduct reflected in the interrogation record and proceedings. *Sánchez*, 2018 IL App (1st) 143899, ¶¶ 88–89. A few months later, under 735 ILCS 5/2-702, the Circuit Court of Cook County found that Sánchez was innocent and granted him a Certificate of Innocence. (Dkt. 236 ¶ 119).

6

Sánchez now asserts twelve causes of action against two groups of Defendants: (1) the Village of Wheeling and several of its police officers; and (2) the City of Evanston and one of its detectives. These causes of action include Section 1983 claims for: deprivation of the right to a fair trial and wrongful conviction against Defendant officers Bush, Oropeza, and Bieschke (Count I); coercive interrogation against Defendant officers Connolly, Oropeza and Bush (Count II); wrongful detention against all Defendant officers (Count III); failure to intervene against all Defendant officers (Count IV); conspiracy against all Defendant officers (Count V); and malicious prosecution (Count VI).[1] Plaintiff also brings state law claims for: malicious prosecution against all Defendant officers (Count VII); violation of the Illinois Constitution, Article II, section 10 against Defendant officers Connolly, Bush, and Oropeza (Count VIII); intentional infliction of emotional distress against all Defendant officers (Count IX); conspiracy against all Defendant officers (Count X); respondeat superior against the Village of Wheeling and the City of Evanston (Count XI); and indemnification under 745 ILCS 10/9-102 against the Village of Wheeling and the City of Evanston (Count XII). (Dkt. 220 at 10.)

Broadly summarized, Sánchez alleges that the defendant officers violated his constitutional rights and Illinois law by fabricating a false case against him. He claims the officers coerced his involuntary confession, fabricated or manipulated

---

[1] This Court dismissed Count VI with prejudice on January 30, 2020. (Dkt. 82.) Plaintiff acknowledges that no federal cause of action exists here for malicious prosecution under existing precedent but raised the issue for purposes of preservation on appeal. (Dkt. 1 at 28 n.1.)

witness statements and evidence, and maliciously prosecuted him for a crime they knew (or should have known) he did not commit, resulting in his wrongful conviction and emotional trauma.

Now before the Court are two motions for summary judgment: one filed by the Wheeling Defendants (Dkt. 220) and one by the Evanston Defendants (Dkt. 223). Defendants together seek summary judgment on all counts. In essence, Defendants contend that Sánchez's claims are not supported by the evidence, that the officers' actions were lawful or at least protected by qualified immunity, and that no triable issues of fact exist. Sánchez opposes the motions, arguing that there is substantial evidence of wrongdoing including numerous factual disputes that must be resolved by a jury. (Dkt. 233.)

## II.     LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up

8

or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III.   DISCUSSION

### A.   Triable Issues Exist For Count II: Coerced Confession (Fifth Amendment & Due Process)

#### 1.   *Legal Standard*

The Fifth Amendment, applied to the states via the Fourteenth Amendment, guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A confession that is not "the product of a rational intellect and a free will" is involuntary and cannot be used against a defendant at trial. *Mincey v. Arizona*, 437 U.S. 385, 398 (1978). Whether a confession was voluntary or coerced is assessed under the totality of the circumstances, considering factors such as the suspect's age, education, and mental state; the length and conditions of detention (e.g., duration of questioning, deprivation of sleep or food); whether Miranda warnings were given; the use of physical force or threats; the use of deception; and any promises or inducements made by police. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001).

Coercion can be mental as well as physical. *See Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991). Although blatant physical abuse is obviously coercive, psychological tactics (trickery, intimidation, relentless pressure) can also overbear a

9

suspect's will, especially if the suspect is young, isolated, or vulnerable. *Haynes v. Washington*, 373 U.S. 503, 514–15 (1963) (sustained incommunicado interrogation with conditional promises of relief deemed coercive); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (police threats to a mother about losing her children rendered confession involuntary).

The ultimate question is whether the suspect's will was overborne by police conduct, so that the statement was not a true exercise of choice. *Fulminante*, 499 U.S. at 287–88. If an officer obtains a confession through coercion, and that confession is used in a criminal case, the officer can be liable under Section 1983. *See Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) (Fifth Amendment is violated when a coerced confession is used against the individual in a criminal case).

### 2. *Analysis*

Viewing the record in the light most favorable to Plaintiff, and applying the totality of the circumstances test, a reasonable jury could find that his confession was involuntary. *See Schneckloth*, 412 U.S. 218, 249; *Fulminante*, 499 U.S. at 285. The evidence demonstrates that Plaintiff was held incommunicado for roughly eleven hours, that repeated requests to contact his mother and to consult with counsel were denied, and that officers communicated that the interview would not end, and that access to his mother would not be permitted unless he confessed. (Dkt. 248 ¶ 31, 45, 55.) Conditioning communication, to which Plaintiff had a right,[2] during custodial

---

[2] Illinois law requires that an arrestee be allowed to communicate with a family member within a reasonable time after arrival at the first place of custody. *See* 725 ILCS 5/103-3(a).

interrogation on self-incrimination is the kind of pressure the Supreme Court has long deemed coercive. *See Haynes v. Washington*, 373 U.S. 503 (1963) (confession involuntary where police withheld communication with family unless suspect signed a statement); *Lynumn v. Illinois*, 372 U.S. 528, 534–35 (1963) (threats and inducements that overbore the suspect's will).

The record reflects a sustained pattern in which detectives responded to Plaintiff's repeated pleas to see his mother with statements that he could speak with her after they "talk[ed] about this," after they "get through this," and after he gave them "the truth." (Dkt. 248 ¶ 51–52.) This sequencing matters. The record permits an inference that requests for his mother were met with a condition, the condition was confession, and only then would contact be allowed. Under *Haynes*, withholding communication with family as a lever to obtain incriminating statements is a form of coercion that can render a confession involuntary. 373 U.S. at 507–514. The same principle applies here, where it appears the officers linked relief from isolation to self incrimination and persisted until Plaintiff adopted their narrative. *Id.*

The record also permits a causal inference between the promise of contact with his mother and the shift in Plaintiff's statements. Plaintiff began by denying involvement, then, after repeated assurances that he could see his mother if he gave the detectives what they called the truth, offered versions that tracked the officers' accident framing and that conflicted with other evidence. (Dkt. 248 ¶¶ 45, 47–48, 50,

---

On direct appeal, the Illinois Appellate Court recognized that refusing Plaintiff's request to call his mother violated that statute. *See People v. Sanchez*, 2018 IL App 1st 143899 ¶ 75.

11

53, 57.) Courts recognize that promises and inducements that realign a suspect's incentives can overbear their will, particularly where the suspect is young, sleep deprived, and isolated. *See Fulminante*, 499 U.S. at 287–88; *Withrow v. Williams*, 507 U.S. 680, 693–694 (1993); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1023–27, (7th Cir. 2006). Unlike routine interrogation tactics, which may involve some deception, a conditional promise of family access has the unique potential to prompt an innocent person to speak irrationally by making confession seem like the only route to immediate relief. *See Haynes*, 373 U.S. at 514.

Illinois law reinforces the coercive effect of this conditioning. The relevant statute guarantees a reasonable opportunity to communicate with family after arrival at the first place of custody. *See* 725 ILCS 5/103-3(a). The Illinois Appellate Court held that refusing Plaintiff's request to call his mother violated that statute. *See People v. Sánchez*, 2018 IL App 1st 143899 ¶ 75. When officers not only delayed that communication, but also conditioned it on confession, the statutory breach became part of the coercive mix. *See United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir. 1966); *Sornberger*, 434 F.3d at 1023–27. On this record, a jury could conclude that the officers' repeated statements, their control over access to Plaintiff's mother, and the timing of his eventual admissions show that the promise of contact, withheld unless he incriminated himself, displaced free choice and produced an involuntary confession. *See Haynes*, 373 U.S. at 513–14.

Defendants argue that *Haynes* is distinguishable. Their position turns on disputed facts, including whether contact with family was effectively conditioned on

admissions and whether the length and character of the detention were materially different. Those are issues for the jury at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Sornberger*, 434 F.3d at 1027. If anything, this record presents a stronger coercion showing than *Haynes*.

In *Haynes*, the Court condemned the practice of conditioning access to family on incriminating admissions. 373 U.S. at 507–14. In Plaintiff's instance, the same condition was repeatedly imposed in response to persistent pleas to speak to his mother, and the officers tied relief from isolation to confession across an extended sequence of exchanges. (Dkt. 248 ¶¶ 40–42, 49, 50–52, 55.) This incremental pressure was greater because it was sustained and explicit, and because it culminated in the very admissions the officers had framed as the price of contact.

Age also tilts this case beyond *Haynes*. Plaintiff was eighteen, sleep deprived, and unfamiliar with his rights. (Dkt. 248 ¶¶ 10–14, 28–32, 38; Dkt. 235 ¶ 53.) Youth increases susceptibility to pressure and is a recognized factor in the voluntariness analysis. *See Withrow*, 507 U.S. at 693–94. Indeed, even the dissent in *Haynes* underscored that the suspect's mature age and experience weighed against a finding of coercion. *See Haynes*, 373 U.S. at 522 (Clark, J., dissenting). By contrast, the combination of youth and isolation here heightens the risk that a conditional promise of maternal contact would override free choice. *Haley v. Ohio*, 332 U.S. 596, 599–601 (1948); *Fulminante*, 499 U.S. 279, 287–88 (1991); *Withrow*, 507 U.S. at 693–94.

The manner of questioning likewise exceeds what *Haynes* described. There is support in the record for a finding of unconsented physical touchings and crowding,

hostile tone, and accusatory language, all while Plaintiff attempted to rest on the floor between sessions. (Dkt. 248 ¶¶ 28–32, 41, 44, 46.) Physical intimidation and aggressive tactics are relevant to whether the Plaintiff's will was overborne. *See Mincey v. Arizona*, 437 U.S. 385, 398–401 (1978); *Payne v. Arkansas*, 356 U.S. 560, 568 (1958). These features amplify the coercive effect of the withheld communications from the already impermissible conduct in *Haynes*.

Finally, the use of misrepresentations about evidence, coupled with a false choice between two inculpatory narratives, further pushes this case past *Haynes*. Courts treat deception as a factor that can contribute to involuntariness, especially when combined with promises or threats that realign a suspect's incentives. *Sornberger*, 434 F.3d at 1023–27; *United States v. Villalpando*, 588 F.3d 1124, 1128–29 (7th Cir. 2009). The record permits a finding that officers misrepresented incriminating proof, insisted that innocence would not be accepted, and told Plaintiff his only options were to label the shooting intentional or accidental. (Dkt. 248 ¶¶ 40–42, 48–52.) When those tactics are layered on top of youth, fatigue, incommunicado detention, and the explicit promise of maternal contact only after confession, a jury could reasonably find that the totality here is at least as coercive as *Haynes*.

And because of numerous disputed facts, qualified immunity cannot be resolved at this time. If the jury credits Plaintiff's version, qualified immunity will not apply because the alleged conduct fits within the category of pressures recognized as coercive by the Supreme Court and by the Seventh Circuit. *Haynes*, 373 U.S. at 514; *see also Pate*, 359 F.2d at 751 (petitioner's confession was involuntary when he

14

was held incommunicado for approximately twenty-eight hours, questioned intermittently, denied repeated requests to speak with his sister until he signed a confession, threatened about charges and punishment, and in the absence of his *Miranda* rights); *Janusiak v. Cooper*, 937 F.3d 880, 888 (7th Cir. 2019) ("The Due Process Clause of the Fourteenth Amendment forbids the use of an involuntary statement against a criminal defendant"); *Curry*, 888 F.3d at 265 (7th Cir. 2018) ("The Fourteenth Amendment makes the Fifth Amendment's Self-Incrimination Clause applicable against the States. . . .[It is violated] by using coerced confessions at pre-trial hearings or trials in criminal cases.").

Defendants argue finally that they cannot be liable for any constitutional injury because the prosecutors were fully aware of the circumstances of the coerced confession and the trial court admitted the confession into evidence after a suppression hearing. (Dkt. 223 at 25–27.) In Section 1983 cases, courts apply "general principles of causation from tort law," which requires Plaintiff to show the alleged tortious act is both (1) a but-for cause; and (2) a proximate cause of the injury. *Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023). There is no dispute that Defendants Bush, Oropeza, and Bieschke adduced confessions that were used against Plaintiff at trial. Defendants' primary argument therefore is that the prosecutor's review of the video confession, and the judge's admission into evidence after a suppression hearing, broke the causal chain. (Dkt. 223 at 25–27) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 584 (7th Cir. 2012) ("the causal responsibility for the violation lies with the prosecutor who chooses to put on the fabricated evidence, not with the fabrication

15

itself."); *Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005) (judge's erroneous decision to admit a coerced confession is a superseding cause when the judge is armed with full and accurate facts)).

But establishing a superseding cause is Defendants' burden, which they have not met. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th Cir. 2011). Defendants' arguments primarily rest on the fact that the prosecutor and the judge were provided the video footage of the confession. (Dkt. 223 at 25–27.) But the coerced confession claims rest on many more facts than merely what occurred during the recorded confession. Plaintiff argues, for example, that preceding the confession, Plaintiff was arrested without probable cause, put in an isolated room overnight, had his phone confiscated, was deprived of sleep, was denied the right to an attorney, held incommunicado, and subjected to an unreliable and falsified PGSR test. (Dkt. 236 ¶¶ 13, 18–19, 31–34.) Even more, Plaintiff presents evidence that not all of this evidence was properly presented to prosecutors and the judge. (Dkt. 234 ¶¶ 98–99.) Accordingly, Plaintiff has presented genuine issues of material fact on whether and to what extent prosecutors and the judge knew the confession was actually coerced.

As such, summary judgment on Count II is denied. The claim of a coerced confession must go to trial against Detective Oropeza and Detective Connolly, who were directly involved in interrogating Plaintiff, and against Detective Bush, who led the critical recorded interrogation alongside Oropeza. A jury will decide whether those officers' interrogation methods were so coercive as to render Plaintiff's confession involuntary.

16

### B. Triable Issues Exist For Count I: Fabrication of Evidence Under the Fourteenth Amendment

Plaintiff brings a Fourteenth Amendment fabrication claim against Defendants Bush, Oropeza, and Bieschke, grounded in two categories of evidence: his own confession and the inculpatory statements attributed to Heladio Flores. (Dkt. 233 at 44.) Judge Feinerman sustained this theory at the pleading stage, holding that allegations officers constructed or fabricated a false confession and fabricated third party statements are cognizable under *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), and that qualified immunity was unavailable because the law in May 2013 clearly prohibited such conduct. (Dkt. 83 at 7–8.)

#### 1. Legal Standard

Officers violate due process when they create evidence they know to be false, and that evidence is later used to deprive a person of liberty. *See Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014); *Whitlock v. Brueggemann*, 682 F.3d 567, 575 (7th Cir. 2012). A plaintiff may pursue coerced confession and fabrication as distinct claims. *See Avery*, 847 F.3d at 439; *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1044, 1048 (N.D. Ill. 2016).

To prevail on fabrication, Plaintiff must show that Defendants created evidence they knew to be false, and that the false evidence was used in some way to deprive him of liberty. *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock*, 682 F.3d at 580; *Petty v. City of Chicago*, 754 F.3d 416, 421–22 (7th Cir. 2014)). Knowledge can be proven with circumstantial proof, since direct

admissions are rare. *See Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2015); *Anderson*, 932 F.3d at 511.

        2.     *Analysis*

There is no dispute that the confession and Heladio's statements were used to secure Plaintiff's conviction, so the first element regarding knowledge is the focus at summary judgment. (Dkt. 233 at 45 n. 7.)

As to the confession, a reasonable jury could find that Bush and Oropeza created a false narrative and then elicited it from Plaintiff. The record supports that they pressed a dichotomy between intentional and accidental guilt, rejected Plaintiff's repeated denials, and steered him toward an accident account while he was young, sleep deprived, and isolated. (Dkt. 248 ¶¶ 28–32, 38, 40–42, 48–53, 57.)

A reasonable jury could also find knowledge of falsity. The confession conflicted with known physical and eyewitness evidence regarding the origin point of the shots, the height of the shooter, the description of the shooter's clothing, the vehicles involved, and the officers were aware of those conflicts during the May 2 and May 3 sessions. (Dkt. 248 ¶¶ 21–24, 37, 58–63, 65, 77, 79, 81, 84, 87–88.) On similar records, courts have allowed fabrication claims to proceed where the plaintiff testified to innocence and the supposed confession clashed with other evidence. *Gray v. City of Chicago*, No. 18-cv-2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) (denying summary judgment for defendants when the confession conflicted with known physical evidence and officers knew this by the time of trial); *Harris v. City of Chicago*, No. 14-CV-4391, 2015 WL 1331101, at *5 (N.D. Ill. Mar. 19, 2015) (denying

dismissal of fabrication claim when the confession conflicted with autopsy reports and witness testimony); *Smith v. City of Chicago*, 785 F. Supp. 3d 356, 404–05 (N.D. Ill. 2025) (denying summary judgment for defendants because the confession described a different weapon than what officers thought was used in the crime).

As to Flores's statements, the record also allows a finding that Bieschke and Bush supplied the key inculpatory assertions and then attributed them to the witness. Flores, then 15-years old, initially denied knowing who the shooter was, but after hours in custody, Flores eventually echoed Plaintiff's "accident" story, a shift that could indicate police pressure or even that Defendants put words in his mouth. (Dkt. 236 ¶¶ 75–77, 79, 89.) During the third and fourth sessions, Bieschke prompted Flores to form a narrative that would place a gun in Plaintiff's hands, to separate himself from Plaintiff at the time of firing, and to claim post shooting transfers that implicated Plaintiff. (Dkt. 248 ¶¶ 70–78, 89.) Both officers also steered Flores toward a gang motive and a plan to kill, and suggested in the first instance that the gun had been thrown into a pond. (Dkt. 248 ¶¶ 80, 82, 85–86, 89–91.)

A jury could find knowledge of falsity from several sources: the pond yielded no weapon on May 3 and again on May 20 and 21; the clothing and height descriptions did not match Plaintiff, a fact the officers explored with Flores; the location of the shooting did not match forensic reports; and the details in Flores's account conflicted with Plaintiff's statements on material points, including the color of the gun, the manner of arrival at the scene, and the provenance of the weapon. (Dkt. 248 ¶¶ 22–23, 57, 61, 77, 79, 81, 87–91.) From this mix, a reasonable jury could infer that the

19

officers created statements they knew were false and then used those statements to secure charges and a conviction. *See Anderson*, 932 F.3d at 510–511; *Stinson*, 868 F.3d at 527. Moreover, the confession was material: Flores's supposed corroboration of Plaintiff's confession was used to bolster the case against him (the prosecutors cited those witness statements in grand jury proceedings and at trial). (Dkt. 248 ¶ 114.)

Defendants argue finally that they are entitled to qualified immunity because there was no clearly established law in 2013 that prohibited their conduct. To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026); s*ee Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017). Although qualified immunity does not require an earlier case with the same facts, it does require a "high degree of specificity" such that " 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.' "[3] *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

---

[3] This degree of specificity is "especially important in the Fourth Amendment context" *Wesby*, 583 U.S. at 64, because it depends heavily on "the facts and circumstances of each particular case," *Zorn*, 2026 WL 795469, at *2 (quotations removed). For example, in *Zorn*, the Supreme Court said that use of a wristlock to remove a protestor was not in violation of clearly established law that prohibited excessive use of force. *Zorn*, 2026 WL 795469, at *3. Relevant precedent prohibited "the gratuitous use of pain compliance techniques" but did not define "gratuitous." *Id.* As a result, the Supreme Court held that the officer was not put on notice whether and how using a wristlock to remove a noncompliant protestor was gratuitous and in violation of the Fourth Amendment.

Applying precedent to the facts of this case (taken as true at summary judgment), it is apparent that Defendants violated clearly established law. *Whitlock*, 682 F.3d at 575–76, 581–82 (police officers and a state prosecutor fabricated evidence in violation of the Fifth Amendment when they coerced an individual to supply false testimony and used it at trial). This is because " 'fabricating evidence violates clearly established constitutional rights.' " *Whitlock*, 682 F.3d at 580 (quoting *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008)).

Defendants focus on the absence of a case about the use of a positive PGSR test during interrogation. (Dkt. 220 at 9.) But the fabrication claims do not turn on the PGSR test,[4] and in any event, there is a factual dispute about whether the test was positive; as such disputed facts surrounding the PSGR test cannot be used to support immunity at summary judgment. *See Orlowski v. Milwaukee County*, 872 F.3d 417, 422–23, n.3 (7th Cir. 2017); (Dkt. 235 ¶ 48.).[5] If anything, the fabrication claim is bolstered by the PGSR test because Plaintiff argues the result was actually negative and Plaintiff has produced evidence that nothing corroborates the purportedly

---

[4] The Supreme Court reaffirmed the necessity of precedent that defines with a "high degree of specificity . . . which actions violate the law." *Zorn*, 2026 WL 795469, at *3. Even assuming this Court were to draw inferences in favor of Defendants (it cannot) that the PGSR test results returned a positive result through negligence or error rather than malfeasance, Plaintiffs have produced sufficient independent evidence that officers knowingly used fabricated testimony at trial—a violation of a clearly established right. *Whitlock*, 682 F.3d at 580.

[5] By the time of trial, it was clear that Plaintiff's gunshot residue test returned negative. (Dkt. 234 ¶ 57.) As to the officers who had knowledge of this, such as Kopecky (who drafted the criminal complaints), the later gunshot residue results that returned negative supply the inference of knowing falsity. (Dkt. 248 ¶ 112); *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) ("the relevant time frame for a plaintiff to show evidence of knowing fabrication by an officer [is] the time of trial") (citing *Anderson v. City of Rockford*, 932 F.3d 494, 511 (7th Cir. 2019)).

21

positive result beyond the officers' say-so. (Dkt. 235 ¶ 48.)[6]

On this record, a jury could find fabrication of the confession and of Flores's statements, and the use of both to obtain Plaintiff's conviction. Indeed, the same factual disputes that preclude summary judgment on the merits, *e.g.*, whether Defendants knowingly generated false evidence, also preclude a finding of immunity, because under Plaintiff's version of facts the constitutional violation would be clear. The qualified immunity question is thus intertwined with the merits.

Liability under Section 1983 is personal, and each Defendant must have participated in the alleged constitutional violation. Indeed, the constitutional violation is not complete until the false confession is introduced at trial, which requires the Court to analyze under "common-law causation principles" whether there is an "unbroken causal chain" for each Defendant. *Avery*, 847 F.3d at 443. When a prosecutor "know[s] the truth and proceed[s] anyway" then the causal chain is broken because the prosecutors "could and should have dropped the charges." *Whitlock*, 682 F.3d at 584. But it is the Defendants' burden to prove a superseding cause with specific evidence; the Plaintiff need not "prove a series of negatives." *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757 (7th Cir. 2011).

---

[6] Some courts have not permitted the use of PGSR test results in evidence because they are unreliable. (Dkt. 234 ¶¶ 57–61); *Sanford v. Russell*, 387 F. Supp. 3d 774, 786 (E.D. Mich. 2019); *Harris v. May*, No. CV 18-273-LPS, 2021 WL 1380596, at *2, *4 (D. Del. Apr. 12, 2021) (noting that officers have discontinued use of PGSR tests because they are "unreliable" and affirming its exclusion from evidence). Moreover, there is no physical evidence in this case corroborating whether the result was actually positive, because the officers immediately discarded the test kit and did not photograph or video the results. (Dkt. 234 ¶¶ 57–61.) The only witnesses to the allegedly positive result was Officer Conboy, Officer Oropeza, and Plaintiff. (*Id.*) As such, the results of the test turn on whether Plaintiff or the officers are telling the truth.

Defendants have not met their burden. Plaintiff has produced sufficient evidence that officers Bush, Oropeza, and Bieschke adduced confessions they knew to be false and that prosecutors used these confessions at trial to secure a conviction. In response, Defendants make a passing comment in a footnote that the video, which recorded the confession, supplied the prosecutor with knowledge of the fabrication. (Dkt. 262 at 20 n. 13.) But the confession videos alone do not satisfy Defendants' burden. Indeed, Plaintiff's argument regarding fabrication is that the officers knew the confession was false because it contradicted other credible evidence in the case. More importantly, Plaintiff provides evidence which disputes that the prosecutor fully reviewed the evidence in the case, supporting an inference that the prosecutor did not know that the confession was false. (Dkt. 233 at 43.) Summary judgment would therefore be improper, and the claim must proceed.

Defendant officers, of course, had direct roles in gathering and presenting the evidence against Plaintiff. For example, Detective Oropeza and Bush questioned Plaintiff and helped elicit the confession, and Detective Bieschke interrogated at least one witness (Flores) and assisted in detaining Plaintiff. (Dkt. 233 ¶¶ 35–89.) The evidence suggests these officers were integral to the creation of the confession and witness statements that led to the charges. By contrast, other officers had more peripheral roles. For instance, Conway and Chirio appear to have been involved principally in the initial detention of Plaintiff at the scene and his transport to the station. (Dkt. 236 ¶¶ 10–14.) Plaintiff nonetheless appears to allege only that they would be liable for failure to intervene. (Dkt. 233 at 44) (arguing that "Defendants

23

Bush, Oropeza, and Biesche" fabricated evidence, but omitting other Defendants).

Accordingly, Plaintiff's fabrication of evidence claim against officers Bush, Oropeza, and Bieschke may proceed; the remaining defendants may similarly be liable for failing to intervene. Defendants' motions for summary judgment is therefore denied.

## C. Triable Issues Exist For Count III: Unreasonable Seizure and Detention Under the Fourth Amendment

Count III alleges an unreasonable seizure and detention in violation of the Fourth Amendment, spanning Plaintiff's initial handcuffed removal from the scene on May 1, 2013 through his pretrial custody that culminated in a wrongful conviction. The claim is cognizable as an unlawful pretrial detention theory under the Fourth Amendment so long as the prosecution ended favorably, as clarified by *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) and *Thompson v. Clark*, 142 S. Ct. 1332 (2022).

### 1. Legal Standard

The governing standard is probable cause, a practical totality-of-the-circumstances test that asks whether the facts known to officers would lead a reasonably prudent person to believe the suspect committed a crime. *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). A *Terry* stop needs only reasonable suspicion, but handcuffing and transport to a station is a de facto arrest that requires probable cause. *See Hayes v. Florida*, 470 U.S. 811, 815-16 (1985); *Dunaway v. New York*, 442 U.S. 200, 216 (1979). Continued detention through legal process also requires probable cause, and detention effected or prolonged by fabricated or misleading evidence violates the Fourth Amendment. *See Manuel*, 137 S. Ct. at 918–19; *Lewis v.*

24

*City of Chicago*, 914 F.3d 472 (7th Cir. 2019).

### 2. Analysis

On the record as it stands now, the initial seizure was an arrest without probable cause. Officers handcuffed Plaintiff at the scene and transported him to the station while admitting they lacked probable cause or reasonable suspicion that Plaintiff or Estrada had committed the shooting (or even any crime at all). (Dkt. 248 ¶ 13); *Dunaway*, 442 U.S. at 216 ("police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation."); *Hayes*, 470 U.S. at 815–16 (officers violate the Fourth Amendment when they remove a person from a "place in which he is entitled to be" without probable cause and "transport" them to the police station "for investigative purposes.")

Defendants instead argue that the handcuffing and transport of Plaintiff to the Wheeling Police Department falls under an "exceptional circumstances" carveout for what constitutes an arrest; they also contend that qualified immunity applies because the Officers did so for his "safety" and were treating him as either a victim or witness. (Dkt. 220 at 26) (citing *Barts v. Joyner*, 865 F.2d 1187, 1192-93 (11th Cir. 1989) (officers were entitled to qualified immunity when they temporarily detained and transported the only eye witness to a recent homicide, who was appearing to cooperate, for brief questioning); *United States v. Fields*, 178 Fed. App'x 890, 893 (11th Cir. 2006) (officer who briefly placed suspect in patrol car because it was raining did not violate the Fourth Amendment).

Defendants' arguments are not persuasive. Defendants' rely on decisions from the Eleventh Circuit, which are not binding on this Court. Second, unlike in *Barts* where the detainee was never "touched or handcuffed" and rode with "other family members" after making "first contact . . . to report a crime," here, Plaintiff was patted down and handcuffed after officers commanded Plaintiff to "get your ass over here, right here, don't go anywhere." *Barts*, 865 F.2d at 1191; (Dkt. 248 ¶¶ 10–12.) Moreover, upon arriving at the station, the officers searched Plaintiff, removed his cell phone, and took him to an isolated interview room. (Dkt. 248 ¶¶ 18–19.) Defendants then proceeded to administer a gunshot residue test. (*Id.* ¶ 19.) These facts permit an inference that Defendants arrested Plaintiff and were treating him as a suspect, not acting for his safety. As such, this case does not present facts so far afield from *Dunaway* and *Hayes* as to warrant qualified immunity. 442 U.S. at 216; 470 U.S. at 815–16. It is clearly established law that handcuffing an individual and transporting them to the police station for investigatory purposes when no probable cause exists violates the Fourth Amendment:

> Our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes*, 470 U.S. at 815–16.

The lawfulness of the ensuing detention in the police station turns on disputed facts that overlap with the fabrication and coercion claims. Defendants say probable

cause arose by early May 2 based on a purported positive residue test, a recorded confession, and corroborating statements. (Dkt. 262 at 22; Dkt. 263 at 23.) Plaintiff counters that each pillar was tainted, the residue test was unreliable and falsified, the confession was coerced, and the witness statements were scripted, so no reasonably trustworthy information ever tied him to the crime. (Dkt. 233 at 55–59.)

If a jury credits the fabrication and coercion evidence, it may find that probable cause never materialized, thus rendering the continued detention unconstitutional. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434–36 (7th Cir. 1993) ("if the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them . . . . [A] conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause"). If the jury credits Defendants' version, probable cause existed by the time charges were approved, which would confine any Fourth Amendment violation to the earliest period. Either way, the timeline and the point, if any, at which probable cause arose present genuine disputes for trial.

By the same token, qualified immunity is not warranted. When evaluating qualified immunity at summary judgment for a false arrest claim, the Seventh Circuit has stated that there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell*, 998 F.2d at 435–36. Although an officer "is entitled to qualified immunity when a reasonable officer could have mistakenly believed that probable cause existed," the same cannot be true for an

27

officer who fabricates evidence to justify detention. *See Manuel*, 137 S. Ct. at 918–19

(fabricated evidence does not establish probable cause). The record permits such a

conclusion.[7]

Finally, Plaintiff's claims are timely. Defendants argue that Plaintiff's pretrial

detention claims began to accrue on the date of conviction. (Dkt. 223 at 31) (citing

*Sopron v. Former Assistant State's Attny, Scott Cassidy*, 2022 U.S. Dist. WL 971563,

at \*4 (N.D. Ill. March 31, 2022)). Not so: Plaintiff's pretrial detention claim depends

on the same evidence as his fabrication and coercion claims. Plaintiff's Fourth

Amendment claim therefore did not accrue until his conviction was overturned. *See*

*Savory v. Cannon*, 947 F.3d 409, 418–21 (7th Cir. 2020) (en banc) (when a Section

1983 claim's success would necessarily imply the invalidity of an outstanding

conviction, *Heck* bars the claim and the limitations period does not begin to run until

the conviction is invalidated) (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994)).

For these reasons, Plaintiff's claim for unlawful pretrial detention survives

summary judgment. Defendants' motion for summary judgment is therefore denied.

### D. Count VI (Failure to Intervene) Survives Against the Remaining Defendants

To succeed on a failure to intervene claim under Section 1983, Plaintiff must

---

[7] Detective Bush is differently situated on Count III. He did not participate in the initial seizure or transport; rather, he joined the investigation after Plaintiff was already in custody. (Dkt. 234 ¶ 69.) But Detective Bush could be liable for unlawful pretrial detention for the interrogations he led. The same holds true for Officer Conway, who led the initial seizure of Plaintiff but did not participate in subsequent interrogations. (Dkt. 234 ¶ 97.) Plaintiff has produced sufficient evidence that each Defendant participated in Plaintiff's unlawful detention in some capacity or is at least liable for failure to intervene; the exact timeline for Plaintiff's pretrial detention claims against each officer will be determined by a jury at trial. This issue can also be handled via jury instructions or special interrogatories as necessary.

demonstrate that Defendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent the violation. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Plaintiff's failure to intervene claim is alleged in the alternative against all Defendants which were not directly involved in the coerced confession, fabrication of evidence, and unlawful pretrial detention. (Dkt. 233 at 68.) Defendants' primary response is that the failure to intervene claims should be dismissed because the underlying claims should also be dismissed. (Dkt. 262 at 24.) But for the reasons discussed in this opinion, those claims survive. Moreover, Plaintiff has produced evidence that the officers were in constant communication with each other (including watching each other's interrogations through a live feed) from the moment of detention all the way through the coerced and false confession. (Dkt. 236 ¶¶ 20, 25–26, 34, 59, 67.) Given the close cooperation between the officers present in this case this claim will proceed to trial.

### E.    Count V (Conspiracy) Also Survives Against All Defendants

As the Seventh Circuit has held, to prevail "on a [federal] conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights.'" *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). Because conspiracies are "often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy." *Beaman*, 776 F.3d at 511.

29

Defendants argue that Plaintiff has insufficient evidence to support that an agreement was formed between the officers to violate Plaintiff's constitutional rights. But these arguments fall flat considering the Court's rulings on the coerced confession, fabrication of evidence, unlawful arrest, and failure to intervene claims. Indeed, when the evidence is viewed together a reasonable juror could conclude that Defendants acted together to concoct a false narrative that Plaintiff committed the homicide.

Accepting all of Plaintiff's facts as true, and drawing all reasonable inferences in Plaintiff's favor, the following is suggestive of a conspiracy: the officers at the scene (Bieschke, Chirio, Oropeza, Pinedo, and Conway) admitted they did not have probable cause to arrest Plaintiff and transport him to the police station. (Dkt. 236 ¶¶ 10–14.) But they did so anyway. Once at the station, Plaintiff's phone was confiscated by other officers, and he was placed in an isolated interrogation room where he was questioned by officers Oropeza and Connolly without *Miranda* rights and an attorney (despite his request for one). (Dkt. 236 ¶¶ 18–19, 28–32.)

After Plaintiff had been left on the floor several hours, Conboy and Oropeza came in and administered a novel and unreliable preliminary gunshot residue test, the results of which Defendants neither photographed nor copied (and that, Plaintiff says, actually showed a negative result). (Dkt. 236 ¶¶ 33, 38.) Conboy then shared the results of the test with other officers. (Dkt. 236 ¶¶ 34.) Subsequently, Bush and Oropeza entered the interrogation room and coerced a confession out of Plaintiff through the use of lies, deception, and false promises that contradicted known

30

evidence about the location of the shooting, the appearance of the gun used, and descriptions of the suspected shooter. (Dkt. 248 ¶¶ 22–23, 57, 61, 77, 79, 81, 87–91.) After conferring with other officers, Officers Bush and Bieschke then interrogated Flores, a 15 year old, and employed similar false evidence ploys and implied threats of prosecution to obtain a statement that, despite contradicting known evidence, blamed Plaintiff for the shooting. (Dkt. 236 ¶¶ 59, 66–92.)

In sum, Plaintiff has produced sufficient circumstantial evidence to permit a reasonable juror to conclude that Defendants formed an agreement to violate Plaintiff's constitutional rights.

### F. Triable Issues Exist For Most State Law Counts

#### 1. Malicious Prosecution

Count VII asserts Illinois malicious prosecution against the individual Defendants. To prevail, Plaintiff must prove that Defendants commenced or continued a criminal proceeding, that it terminated in his favor, that probable cause was absent, that defendants acted with malice, and that he suffered damages. *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74 (Ill. 2021). Favorable termination and damages are not genuinely disputed: Plaintiff's conviction was reversed and charges were dismissed in 2018, and he endured years of custody and attendant harms.

The contested issues are probable cause, malice, and causation. But Count VII turns on the same factual core developed above. If the jury credits Plaintiff's evidence that officers coerced his confession and fabricated or steered key third party

31

statements, and that they knew those accounts conflicted with physical and eyewitness evidence, then the disputed elements fall in his favor.

Illinois defines probable cause as facts that would lead a person of ordinary care and prudence to believe, or to entertain an honest and strong suspicion, that the plaintiff committed the offense. *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 791 N.E.2d 1206, 1219 (2003). In this context, the inquiry centers on what officers knew and conveyed when prosecution was initiated or maintained, and whether they supplied false inculpatory matter or withheld material exculpatory facts. Similar to the Fourth Amendment claim, if a jury finds that the PGSR indication, the confession, and third-party statements were fabricated or obviously unreliable, and that defendants knew or should have known as much yet pressed forward, it may find a lack of probable cause. If the jury instead credits Defendants' account that those items were reasonably trustworthy at the time, the element fails.

Malice in Illinois means a purpose other than bringing the Plaintiff to justice, which may be inferred from want of probable cause together with surrounding circumstances. *See Beaman*, 2021 IL 125617, ¶140 (malice includes "any reason other than to bring the responsible party to justice . . . [and] may be inferred from a lack of probable cause when the circumstances are inconsistent with good faith by the prosecutorial team and lack of probable cause has been clearly proved."). Available evidence in this case showing fabrication and conscious disregard of conflicting proof could support an inference of malice. Credibility disputes thus preclude resolution as a matter of law.

Causation requires that each Defendant commenced or continued the prosecution. Officers are not liable if a prosecutor independently charges based on truthful, complete information. *See Reed v. City of Chicago,* 77 F.3d 1049, 1053–54 (7th Cir. 1996). If officers knowingly supplied false evidence, the causal chain is not broken. *Id.* On this record, and for similar reasons as previously discussed regarding fabrication and coercion, a jury could find that Defendants caused the prosecution by presenting or shaping the evidentiary narrative through interrogations and by influencing charging decisions. Moreover, the trial court and jury actually relied on the fruits of these interrogations. (Dkt. 236 ¶ 114.) Defendants' motion for summary judgment against Plaintiff's state-law malicious prosecution claims is therefore denied.

### 2. Intentional Infliction of Emotional Distress

Under Illinois law, intentional infliction of emotional distress requires proof that the Defendant engaged in extreme and outrageous conduct, that the Defendant intended to cause severe emotional distress or knew there was a high probability that such distress would result, and that the conduct in fact caused severe emotional distress. *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988); *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767–68 (Ill. 1976). Conduct is extreme and outrageous when it goes beyond all bounds of decency, is regarded as intolerable in a civilized community, and is assessed in context, including any abuse of authority. *See Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). Police misconduct cases recognize that coercive tactics, threats, or fabrication can satisfy this standard when

33

supported by the record. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030–31 (7th Cir. 2006); *Lopez v. City of Chicago*, 464 F.3d 711, 720–21 (7th Cir. 2006).

If the jury credits Plaintiff's account, the elements are met. For the reasons discussed in other parts of this opinion, the record could allow a finding that officers isolated an eighteen year old through the night, conditioned contact with his mother on incriminating statements, pressed a binary accident or intent script while rejecting denials, and advanced assertions about evidence that did not match known facts, producing a confession the officers knew or should have known was unreliable and false. A jury could find this pattern extreme and outrageous, could infer intent or at least knowledge of a high probability of severe distress from sustained pressure and the use of family access as leverage, and could find causation and severity from Plaintiff's documented breakdown, persistent pleas for his mother, and the ensuing years of custody. *See Gray*, 2022 WL 910601, at *17; *Hill v. City of Chi.*, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020); *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003).

This claim must be resolved by a jury as to all remaining individual Defendants, including the arresting officers (such as Officer Conway). Although Conway was primarily involved with the arrest, a jury could find that his unlawful arrest materially contributed to the overall outrageous course of conduct and to Plaintiff's severe distress. In sum, the Defendants liability for IIED turns on the jury's assessment of the outrageousness of each officer's conduct in the light of the full context established elsewhere in this opinion. Defendants' motions for summary

34

judgment on IIED are therefore denied.

> 3. *The Illinois Constitution-Based Self-Incrimination Claim Is Dismissed Because it is Duplicative and Barred by State Law*

Unlike the foregoing state-law counts, Defendants are entitled to summary judgment on Count VIII, which alleges a self-incrimination violation under the Illinois Constitution. Illinois recognizes an implied damages action under the state constitution only where no adequate alternative remedy exists, and courts decline duplicative state constitutional claims when federal law supplies a fully coextensive remedy. *See Woods v. Clay*, No. 01 C 6618, 2005 WL 43239, at *24 (N.D. Ill. Jan. 10, 2005). Plaintiff's Fifth Amendment claim provides the vehicle for the same alleged wrong, so a separate state constitutional claim is necessarily unavailable. No further analysis is required, because any issues presented by Count VIII are resolved by the Court's ruling on the federal self-incrimination claim. Defendants' motion for summary judgment as to Count VIII is therefore granted.

> 4. *State Civil Conspiracy*

Count X, alleging state law civil conspiracy, must proceed to trial. Under Illinois law, civil conspiracy requires an agreement between two or more persons to accomplish an unlawful purpose or a lawful purpose by unlawful means, plus one or more overt tortious acts in furtherance that proximately cause injury. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). An agreement may be proven by circumstantial evidence and by reasonable inferences drawn from concerted action, timing, and coordinated roles. *Id.*

As Defendant Village of Wheeling correctly asserts, the "Illinois state law civil

conspiracy and § 1983 civil conspiracy claims are substantively the same. . . . The substantive similarity between state and § 1983 civil conspiracy claims means the arguments set forth for summary judgment on Count V apply equally with regard to Count X." (Dkt. 220 at 37) (citing *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. Oct. 4, 2016); *see also Starks*, 123 F. Supp. 3d at 1065 (recognizing Illinois and federal conspiracy law "substantively similar")). Defendant is correct, which means that, in view of the ruling denying summary judgment on Count V, Defendants' motions for summary judgment on the state civil conspiracy claim (Count X) are denied.

### 5. *Respondeat Superior and Indemnification*

Defendants' motions for summary judgment on Count XI (Respondeat Superior) are denied. The Village of Wheeling and the City of Evanston remain in the case to answer in damages for state law torts committed by their officers within the scope of employment. Under Illinois law, an employer is vicariously liable for torts committed by an employee acting within the scope of their employment. *See Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 990, Ill. 2007. The parties do not dispute scope. Accordingly, if any officer is found liable on Counts VII through X (state law claims), the Defendant is vicariously liable under Illinois respondeat superior principles.

Similarly, the motions for summary judgment on Count XII, Indemnification, are denied. Under Illinois law, a local public entity must pay a judgment for compensatory damages for an employee's tort committed within the scope of

36

employment, *see* 745 ILCS 10/9-102, and federal courts routinely implement that obligation post-verdict. *See Wilson v. City of Chicago*, 120 F.3d 681, 684 (7th Cir. 1997); *Yang v. City of Chicago*, 137 F.3d 522, 526 (7th Cir. 1998). As a result, the Village of Wheeling and the City of Evanston must indemnify any compensatory damages awarded on the state law claims, and indemnification will be addressed in the judgment rather than submitted to the jury.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are denied in part and granted in part.

SO ORDERED in No. 19-cv-02437.

Date: March 31, 2026

_____
JOHN F. KNESS
United States District Judge

37